714 P.2d 878

**WALTER O. BOSWELL MEMORIAL HOSPITAL, INC., an Arizona corporation, Plaintiff-Appellee,**

v.

**YAVAPAI COUNTY, a body politic, Defendant-Appellant.**

**No. 1 CA–CIV 8329.**

Court of Appeals of Arizona, Division 1, Department B.

Feb. 4, 1986.

Charles R. Hastings, Yavapai Co. Atty. by M. Randolph Schurr, Deputy Co. Atty., Prescott, for defendant-appellant.

Gammage & Burnham, by Richard B. Burnham, Curtis Ullman, Phoenix, for plaintiff-appellee.

## OPINION

FROEB, Chief Judge.

The issue presented in this appeal is whether medical expenses may be deducted from resources to calculate net worth for determining eligibility for indigent medical care pursuant to A.R.S. § 11–297(B)(2).

Although primary responsibility for indigent health care was shifted to the state in October 1982 through the implementation of the Arizona Health Care Cost Containment System (AHCCCS), each county retains a residual responsibility to provide health care to any indigent county resident who is not enrolled in AHCCCS. *See* A.R.S. §§ 11–291 and 36–2903(A) and (B). On May 2, 1984, Walter O. Boswell Memorial Hospital, Inc. (Boswell) filed a complaint against Yavapai County premised on this residual responsibility. Boswell sought reimbursement for medical services provided to Andrew Stahl. Summary judgment was entered in favor of Boswell on March 27, 1985. This appeal followed.

The facts giving rise to this litigation are not disputed. Andrew Stahl entered Boswell on an emergency basis on October 25, 1983, and remained there until his death of cancer on December 21, 1983. Boswell notified both Yavapai County and Maricopa County of Stahl's admission and his possible eligibility for indigent health care benefits. Yavapai County refused Boswell's later demand for reimbursement on the basis that Stahl did not meet the eligibility standards.

A.R.S. § 11–297 defines indigency for purposes of receiving medical benefits in terms of residency, income and resources. The parties agree that Stahl met the residency and income requirements, but disagree as to his eligibility based on A.R.S. § 11–297(B)(2) which provides:

B. For the purposes of this section, an "indigent" is a resident of the county who:

\*     \*     \*     \*     \*     \*

2. Does not have resources of all persons in the household, including but not limited to equity in a house or car, with a net worth in excess of thirty thousand dollars with no more than five thousand dollars cash or other liquid assets.

The following depicts Stahl's assets and liabilities on the date of his hospitalization:

| ASSETS | | LIABILITIES | |
|---|---|---|---|
| Liquid Assets | | | |
| Cash | $ 4,200 | Roanoke Memorial | |
| Certificate | | Hospital | $ 6,997.31 |
| of Deposit[1] | 8,000 | 10/25/83 Medical Expenses | |
| Life Insurance | | (other than Boswell) | 5,797.70 |
| (surrender value) | 700 | 10/25/83 Boswell charges | 3,778.23 |
| Total | $12,900 | Total | $16,573.24 |
| Non-Liquid Assets | | | |
| House | $15,769 | | |
| Car | 1,500 | | |
| Truck | 700 | | |
| Total | $17,969 | | |
| TOTAL ASSETS | $30,869[2] | | |

As illustrated above, at the time of his hospitalization, Stahl's total assets exceeded the statutory limit by $869 and his liquid assets exceeded the maximum allowable level by $7,900. During his hospitalization, Stahl incurred medical expenses of at least $29,784.87, including hospital charges payable to Boswell in the sum of $23,987.17. The trial court determined that at some point during his hospitalization Stahl became eligible for health care at the county's expense. The court made this determination by finding that Stahl's medical expenses must be used to offset, or spend down, his excess resources. The judgment states that spend down of excess resources must be permitted in order to sustain the constitutionality of the statute. The court's order further held that Stahl's medical expenses must be offset first against his liquid assets and then against unliquidated assets.

Yavapai County contends that A.R.S. § 11–297 is clear and unambiguous and precludes the deduction of unsecured liabilities from resources to determine eligibility. The county points out that A.R.S. § 11–297(E)(1) expressly provides for "spend down" of income by medical expenses incurred by an applicant during the 12 months prior to a determination of eligibility but provides no similar provision relative to resources.

The county asserts that A.R.S. § 11–297(B)(2) provides for a computation of "net worth of resources" as distinct from "net worth of a person." It argues that only debts secured by specific property may be deducted from the value of that property in determining its net worth.

In further support of its position, the county relies by analogy on various state and federal administrative regulations. The definition of indigency contained in A.R.S. § 11–297 is expressly incorporated for purposes of eligibility for AHCCCS. *See* A.R.S. § 36–2901(4)(a). Thus, the county argues that administrative regulations implementing AHCCCS should be considered pertinent to that definition. One such regulation is A.C.R.R. R9–22–323 which states that "equity" in resources shall be counted to determine whether resources are within allowable eligibility limits. A.C.R.R. R9–22–324 further provides:

The county eligibility worker shall evaluate all of the property and resources reported by the applicant or family household available as of the date of application, redetermination, or interim change.

1. Calculate the total value of the liquid assets.

2. Determine the total equity in the remaining property and resources.

---

**1.** The certificate of deposit was in the amount of $14,000 but had been pledged as collateral for a $6,000 loan from Valley National Bank. The county acknowledged in the trial court that the value of an asset should be reduced by the amount of a lien or encumbrance on that particular asset.

**2.** The final judgment states that total assets equal $30,769. However, on appeal, both parties list assets totaling $30,869.

3. Calculate the net worth by adding the value of the total liquid assets to the total equity in the non-liquid assets.

The use of the term "equity" in the regulations has been interpreted by Yavapai County to mean the value of property less secured claims against that property.

The county also notes the similarity between AHCCCS eligibility requirements and federal medicaid program requirements. Like A.R.S. §§ 11–297 and 36–2901,[3] 42 U.S.C. § 1396a(17) establishes eligibility requirements including maximum income and resource levels. Federal regulations implementing the statute expressly require deduction of incurred medical bills from income for purposes of determining eligibility. See 42 C.F.R. § 435.831(c) and (d) (1984). However, like A.R.S. § 11–297, the federal regulations do not expressly provide for spend down of resources. Compare 42 C.F.R. § 435.831(c) and (d) with 42 C.F.R. §§ 435.840—435.845 (1984). The county argues that the federal regulations therefore do not permit such a spend down. However, we note one decision interpreting these regulations which holds to the contrary.

In *Haley v. Commissioner of Public Welfare*, 394 Mass. 466, 476 N.E.2d 572 (1985), the Supreme Judicial Court of Massachusetts was asked to interpret 42 U.S.C. § 1396a(17) and its implementing regulations 42 C.F.R. §§ 435.840–435.852 (1984). The state argued that the regulations' express provision allowing spend down of income and silence with respect to spend down of resources resulted in a clear and unambiguous preclusion of a resource spend down. The state's position was supported by medicaid action transmittal No. 80–58 from the Health Care Financing Administration (HCFA) of the United States Department of Health and Human Services, advising state agencies that resource spend down could not be used as a method of evaluating resources. This was a reversal of a prior position taken by HCFA.

The Massachusetts court rejected this argument.

In *Haley,* the court held that the department's policy of determining eligibility without the application of a resource spend down did not comply with the requirement that an individual be allowed to retain a reasonable level of both resources and income. See 42 C.F.R. §§ 435.840, 435.841, 435.850, and 435.851 (1984). In reaching this conclusion, the court found that a resource spend down was consistent with the goals of the medicaid program and was the only reasonable interpretation of the statute and the federal regulations. It set forth the following examples of the effect of eligibility determinations without a resource spend down:

Without a resource spend down, an individual with excess resources who is aware of the department's policy is in a better position than the average individual who is unaware of the policy. The aware individual can actually spend down his excess resources as soon as he incurs medical expenses which, absent excess resources, would be eligible for payment. Once the resources are actually absorbed, the individual is eligible for payment of medical expenses.

The paradox occurs with a less sophisticated individual or an individual who is not in a condition actually to spend down resources. Upon application to the department, this individual would be informed that, because of excess resources, medical expenses incurred in the last three months would not be eligible for payment. This result would occur regardless of how miniscule the excess resources were in comparison to the medical expenses incurred in that three-month period.

476 N.E.2d at 578–579, n. 8.

The court noted that one of the plaintiffs had $497.12 in excess resources. Her hospital expenses for a 4–½ month period were $17,517.31. The court stated that common

3. A.R.S. § 36–2901 also defines eligibility for AHCCCS as persons defined as mandatorily eligible by 42 U.S.C. § 1396a (1980).

sense and simple mathematics required a conclusion that the $497.12 excess would have been absorbed in the first few days of hospitalization. However, the patient was physically incapable of actually spending down those resources. It found that the department's denial of retroactive eligibility and refusal to deem her eligible until she actually paid the $497.12 was an unreasonable result. We find likewise that the result would be unreasonable if we were to accept Yavapai County's position with respect to A.R.S. § 11–297 under the circumstances of this case.

The parties agree that the Stahls had a total annual income of $9,990 prior to Stahl's hospitalization on October 25, 1983. A.R.S. § 11–297(B)(1)(b) permitted a married individual living with his or her spouse to have an annual income of $3,325[4] and still qualify for county health care. Therefore, the Stahls had "excess" income of $6665. However, for purposes of eligibility, this income was reduced by the amount of medical expenses incurred during the preceding 12 months. On the date of Stahl's hospitalization, he incurred medical charges payable to Boswell in the amount of $3,778.23 and charges of $5,797.70 payable to other health care providers. As a result, the parties agree that on that date Stahl incurred sufficient medical expenses to eliminate the excess income and to render him eligible under the statutory income guidelines.[5] *See St. Joseph's Hospital and Medical Center v. Maricopa County,* 130 Ariz. 239, 635 P.2d 527 (App.1981).

On the day of Stahl's hospitalization he had total assets amounting to $30,869, which was $869 over the overall statutory allowance for total resources and $7,900 over the allowance for liquid assets. However, during Stahl's hospitalization, he incurred medical expenses of at least $29,784.87, including hospital charges payable to Bosswell of $23,987.17. At some point during this period of time, Stahl's medical expenses exceeded the maximum allowable resource level.[6]

The county apparently concedes that had Stahl actually paid these bills during the course of his hospitalization, he would have been eligible for county aid. However, the county contends that to become eligible Stahl had to actually pay $869 out of his resources.

Boswell argues that the county's position ignores reality. The typical emergency patient does not arrive at a hospital with a summary of his financial condition to compare with the statutory guideline. The patient is often unconscious or otherwise physically or emotionally unable to provide the hospital with sufficient financial information to make that immediate determination. Moreover, depending on the patient's condition during the hospitalization, he may not be in a position at the precise moment that the charges equal the spend down amount to pay those medical bills in order to establish eligibility. Boswell further contends that its election to forego an immediate attempt to collect funds from the Stahls did not prejudice the county.

Statutes shall be liberally construed to effect their objects and promote justice. A.R.S. § 1–211(B). Although administrative interpretations of a statute should be accorded some weight in construing a statute, administrative interpretations are not binding on this court. *McLeod v. Chilton,* 132 Ariz. 9, 16, 643 P.2d 712, 719 (App.

---

**4.** Although under A.R.S. § 11–297(B)(1)(b) a married individual living with his or her spouse may have an annual income of $3,333.33 ($2500 + (33⅓ ´2500) = $3,333.33), the parties have used the amount $3,325.00. Since the difference of $8.33 does not affect the outcome in the present case, we use the amount stated by the parties.

**5.** Rather than attempt to calculate precisely when on October 25th Stahl incurred medical expenses equal to the spend down amount, the parties agreed to a proportional allocation formula and agreed that the county would not be responsible for payment of the first $2,632.68 in charges. This allocation was based on a ratio between expenses incurred on that date which were payable to Boswell and expenses payable to other health care providers.

**6.** This result would obtain without considering any arguable spend down for a debt owed to Roanoke Memorial Hospital for medical care incurred in June of 1982.

1981), *cert. denied,* 459 U.S. 877, 103 S.Ct. 172, 74 L.Ed.2d 141 (1982). An administrative interpretation upon which the public has relied or as a result of which the public has made extensive investments is given greater emphasis. *See Chee Lee v. Superior Court in and for Maricopa County,* 81 Ariz. 142, 302 P.2d 529 (1956). It cannot be said that the present administrative interpretation of A.R.S. § 36–2901, which incorporates the definition of "indigent" from A.R.S. § 11–297, has resulted in reliance by the public with resulting investments. Further, the AHCCCS program is relatively new and has undergone several statutory changes in the implementing regulations. *See* Historical Note to A.C.R.R. R9–22–324. In any event, a statute cannot be changed by administrative regulations. *See Begay v. Graham,* 18 Ariz.App. 336, 339, 501 P.2d 964, 967 (1972).

■ In *Begay v. Graham,* this court considered an eligibility issue under former Arizona statutes and observed by way of analogy that "[t]he federal courts, in interpreting the Social Security Act, have tended to construe its provisions liberally in favor of those seeking its benefits." 18 Ariz.App. at 339, 501 P.2d at 967. The case notes that the Social Security Act required that only available income and resources should be considered in determining the needs of welfare applicants. Similarly, we find that a reasonable construction of A.R.S. § 11–297 requires recognition that indigency is defined in terms to allow individuals to maintain a certain level of *income and resources* while still qualifying for medical assistance. We note also that spend down of income for purposes of eligibility for medicaid is based on *incurred* medical expenses rather than actual expenditure. *DeJesus v. Perales,* 770 F.2d 316, 319 (2d Cir.1985); *Hogan v. Heckler,* 769 F.2d 886, 889 (1st Cir.1985); *Gadway v. Blum,* 567 F.Supp. 772, 775 (N.D.N.Y. 1983). Construing the statute to permit a "spend down" of resources by a mathematical calculation of incurred medical expenses rather than actual expenditures promotes the intent of the statute. Further, it

is reasonable to calculate these expenses against liquid assets first.

An individual's qualification for benefits should not be dependent upon the fortuitous circumstances of his being advised or being physically capable to make the actual expenditure. We find that the trial court's interpretation of A.R.S. § 11–297 was reasonable and correct under the circumstances of this case. We find it unnecessary to determine whether such interpretation is constitutionally mandated as argued by appellee. Likewise, we find it unnecessary to determine whether there is a one-year limitation on resource spend down because the expenses involved here occurred after Stahl's admission to the hospital.

## RATE OF REIMBURSEMENT

■ Yavapai County also contends that if it is held responsible for payment of Stahl's account, it is only required to reimburse Boswell at medicare/medicaid rates rather than at Boswell's full billed charges. We agree.

In October of 1983, when Stahl was treated, A.R.S. § 11–297.01(C) stated:

> The cost of hospital care and treatment at such private hospital ... shall be a county charge payable by the county in which the patient maintains his residence to the private hospital ... at a rate determined by the same method used for reimbursing providers of services under federal medical assistance programs or at such lower rate as the county and the private hospital ... may agree upon.

In *St. Joseph's Hospital and Medical Center v. Maricopa County,* 138 Ariz. 127, 673 P.2d 325 (App.1983), this court determined that medicaid rates would be used if the patient was treated prior to 1978. However, the court permitted payment of full billed charges for treatment after 1978 based on language in A.R.S. § 41–1837 which permitted recovery of "reasonable costs." The legislature amended A.R.S. § 41–1831 in 1982 and deleted the definition of reasonable costs of medical expenses. Thus, once again A.R.S. § 11–297.-

01(C) determined the rate of reimbursement as it did prior to 1978.

Nevertheless, Boswell argues that Laws 1981, 4th Special Session, ch. 1, § 16, the original AHCCCS legislation, prohibits a reduction in the reimbursement rate. The portion of the session laws relied upon by Boswell provides:

Notwithstanding any provision of law or rule or regulation to the contrary, the eligibility standards, *benefit levels* and categories of service for hospitalization and medical care of the indigent sick in effect in any county on January 1, 1981, or required by law to have been in effect on that date, may not be reduced until January 31, 1986, except that persons eligible for services provided through the Arizona health care cost containment system pursuant to title 36, chapter 29, Arizona Revised Statutes, are not eligible for the same services from any county. (Emphasis added.)

Boswell contends that the rate of reimbursement is a "benefit level" and cannot be reduced.

The county argues that the legislature could not have intended benefit levels to mean the same as reimbursement levels. In support of this contention, it notes that in 1984 the legislature amended A.R.S. § 11–297.01(B) and incorporated the reimbursement level limitation found in A.R.S. § 36–2903(W) (now A.R.S. § 36–2903.01(I) or (J) and deleted reference to federal medical assistance programs in A.R.S. § 11–297.01(C). Thus, the county argues that since the legislature itself changed the "reimbursement level" in 1984 when it amended A.R.S. § 11–297.01, it could not have equated reimbursement level with benefit level.

We find this argument persuasive. Further, read in its entirety, § 16 appears to deal only with protecting the rights of the indigent sick to medical care rather than the rights of providers. Accordingly, this matter must be remanded to the trial court for a determination of the proper reimbursement to Boswell based on medicaid rates in effect at the time Stahl was treated.

This matter is remanded to the trial court for proceedings in accordance with this opinion.

CONTRERAS and MEYERSON, JJ., concur.