ATKINS, COMMISSIONER, MASSACHUSETTS
DEPARTMENT OF PUBLIC WELFARE *v.*
RIVERA ET AL.

No. 85–632.  Argued April 21, 1986—Decided June 23, 1986

BLACKMUN, J., delivered the opinion for a unanimous Court.

*H. Reed Witherby*, Assistant Attorney General of Massachusetts, argued the cause for petitioner. With him on the briefs was *Francis X. Bellotti*, Attorney General.

*Jerrold J. Ganzfried* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Fried, Assistant Attorney General Willard, Deputy Solicitor General Geller, John F. Cordes*, and *Nicholas S. Zeppos*.

*Rene H. Reixach, Jr.*, argued the cause for respondents and filed a brief for respondent McKenna.*

---

*\*Robert Abrams*, Attorney General, *Robert Hermann*, Solicitor General, *Peter H. Schiff*, Deputy Solicitor General, and *Alan W. Rubenstein*, Assistant Attorney General, filed a brief for the State of New York as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the Gray Panthers Advocacy Committee et al. by *Roger A. Schwartz* and *Gill Deford;* and for Susan Reed et al. by *Evelyn R. Frank.*

JUSTICE BLACKMUN delivered the opinion of the Court.

This case concerns the means by which a State may calculate eligibility for medical-assistance benefits (Medicaid) under Title XIX of the Social Security Act.

In Massachusetts, persons who lack sufficient income, measured on a monthly basis, to meet their basic needs automatically qualify for Medicaid. The Commonwealth, however, also provides Medicaid benefits to persons, like respondents, who earn enough to meet their basic needs, but whose medical expenses within a 6-month period consume the amount by which their earnings exceed what is required for basic needs. Construing the Act's requirement that assistance for the two groups be calculated using the "same methodology," the Massachusetts Supreme Judicial Court held invalid the Commonwealth's use of a 6-month period for measuring medical expenses. The court ruled that inasmuch as a 1-month period is used to measure the income of those with insufficient means, an identical period must be used to measure medical expenses for persons like respondents. Because this holding conflicts with rulings of two Federal Courts of Appeals,[1] we granted certiorari. 474 U. S. 1018 (1985).

I

Medicaid, enacted in 1965 as Title XIX of the Social Security Act, 79 Stat. 343, as amended, 42 U. S. C. § 1396 *et seq.* (1982 ed. and Supp. II), is designed to provide medical assistance to persons whose income and resources are insufficient to meet the costs of necessary care and services. See *Schweiker* v. *Hogan*, 457 U. S. 569, 571 (1982). The Federal Government shares the costs of Medicaid with States that

---

[1] See *Hogan* v. *Heckler*, 769 F. 2d 886 (CA1 1985), cert. pending *sub nom. Hogan* v. *Bowen*, No. 85–6386 (construing Massachusetts provision); *DeJesus* v. *Perales*, 770 F. 2d 316 (CA2 1985), cert. pending, No. 85–6337 (construing identical New York provision).

elect to participate in the program. In return, participating States are to comply with requirements imposed by the Act and by the Secretary of Health and Human Services. See 42 U. S. C. § 1396a (1982 ed. and Supp. II); *Schweiker* v. *Gray Panthers*, 453 U. S. 34, 36–37 (1981).

States participating in the Medicaid program must provide coverage to the "categorically needy." 42 U. S. C. § 1396a(a)(10)(A) (1982 ed. and Supp. II). These are persons eligible for cash assistance under either of two programs: Supplemental Security Income for the Aged, Blind, and Disabled (SSI), 42 U. S. C. § 1381 *et seq.* (1982 ed. and Supp. II), or Aid to Families with Dependent Children (AFDC), 42 U. S. C. § 601 *et seq.*[2] (1982 ed. and Supp. II). Congress considered these persons "especially deserving of public assistance" for medical expenses, see *Gray Panthers*, 453 U. S., at 37, because one is eligible for AFDC or SSI only if, in a given month, he or she earns less than what has been determined to be required for the basic necessities of life. AFDC and SSI assistance are intended to cover basic necessities, but not medical expenses. Thus, if a person in this category also incurs medical expenses during that month, payment of those expenses would consume funds required for basic necessities.

A participating State also may elect to provide medical benefits to the "medically needy," that is, persons who meet the nonfinancial eligibility requirements for cash assistance under AFDC or SSI, but whose income or resources exceed the financial eligibility standards of those programs.[3] See

---

[2] Congress created SSI in 1972, 86 Stat. 1465, to replace three existing categorical assistance programs—Old Age Assistance, 42 U. S. C. § 301 *et seq.* (1970 ed.); Aid to the Blind, 42 U. S. C. § 1201 *et seq.* (1970 ed.); and Aid to the Permanently and Totally Disabled, 42 U. S. C. § 1351 *et seq.* (1970 ed.). These programs, together with AFDC, previously had been state administered with state-eligibility standards. See *Schweiker* v. *Hogan*, 457 U. S. 569, 581–582, n. 18 (1982).

[3] In Massachusetts, the income eligibility level for the medically needy is comparable in most, but not all, instances to the corresponding SSI or

*Schweiker* v. *Hogan,* 457 U. S., at 581–582.   Under 42 U. S. C. § 1396a(a)(17), the medically needy may qualify for financial assistance for medical expenses if they incur such expenses in an amount that effectively reduces their income to the eligibility level.   Only when they "spend down" the amount by which their income exceeds that level, are they in roughly the same position as persons eligible for AFDC or SSI: any further expenditures for medical expenses then would have to come from funds required for basic necessities.

In creating the spenddown mechanism of 42 U. S. C. § 1396a(a)(17) (1982 ed. and Supp. II), Congress provided that a State is to take into account, "except to the extent prescribed by the Secretary, the costs . . . incurred for medical care."   Pursuant to this statute, the Secretary of Health and Human Services has instructed state agencies to "use a prospective period of not more than 6 months to compute income" of the medically needy.   42 CFR § 435.831 (1985).

A State electing to assist the medically needy must determine eligibility under standards that are "reasonable" and "comparable for all groups."   42 U. S. C. § 1396a(a)(17).   In addition, and significantly for present purposes, state plans for Medicaid must describe

> "the single standard to be employed in determining income and resource eligibility for all such groups, and the methodology to be employed in determining such eligibility which *shall be the same methodology which would be employed* under [AFDC or SSI]."   42 U. S. C. § 1396a(a)(10)(C)(i)(III) (emphasis added).

---

AFDC standard of need.   The maximum income eligibility limits for some medically needy applicants are, in the case of small families (one to three persons), higher than those used for AFDC coverage.   See 106 Code of Mass. Regs. §§ 506.410 and 304.410 (1985).   This results in some medically needy families in Massachusetts qualifying for Medicaid without use of a spenddown.

## II

Respondent Rivera is employed outside her home and is the mother of two children. She receives no medical benefits from her job, and earns an amount slightly in excess of that which would permit her to qualify for AFDC. In 1983, Rivera applied to the Massachusetts Department of Public Welfare for Medicaid. Massachusetts has chosen to participate in the Medicaid program, Mass. Gen. Laws § 118E:1 *et seq.* (1984), and also to provide coverage to medically needy persons.

To determine Rivera's eligibility for Medicaid, the Department first calculated her gross monthly income. See 106 Code of Mass. Regs. (CMR) §§ 505.200, 505.210, 505.320 (1985). Next, the Department prescribed certain deductions and disregards to arrive at her monthly "countable income" of $535.30.[4] See 106 CMR §§ 505.200 and 506.100–506.200 (1985). See also 42 CFR § 435.831(a) (1985). Rivera's monthly countable income exceeded the Medicaid eligibility limit by $100.30. See 106 CMR § 506.400 (1985). See also 42 U. S. C. §§ 1382(c)(1) and 602(a)(13) (1982 ed. and Supp. II). As a result, she did not qualify for Medicaid at that time. She would be able to qualify at a later date, provided her excess income was subject to being consumed or spent down by medical expenses.

Massachusetts has adopted a 6-month period over which the spenddown is calculated. Mass. Gen. Laws § 118E:10 (1984); 106 CMR §§ 506.400 and 506.510 (1985). This is the maximum permitted under the federal regulations. See 42 CFR § 435.831 (1985). Accordingly, the Department multiplied Rivera's excess $100.30 by six; she thus could receive Medicaid during the 6-month period beginning with the date of her first medical service only after she spent down $601.80

---

[4] In administrative and state-court proceedings, Rivera raised a challenge to the manner in which certain portions of her income were disregarded. That issue, however, is not presently before this Court.

on medical expenses.[5] The Department's decision deny-
ing assistance was upheld by the Welfare Appeals Referee.
App. to Pet. for Cert. A46.

Rivera then sought injunctive relief in State Superior
Court against use of the 6-month period. She argued that
the 6-month period for calculating the income of medically
needy applicants violates the "same methodology" require-
ment of 42 U. S. C. §§ 1396a(a)(10)(C)(i)(III) and 1396a(a)(17)
(1982 ed. and Supp. II), because the Act mandates that
AFDC and SSI determinations be calculated on the basis of
income earned in a 1-month period. The use of the shorter
period would have permitted Rivera to receive Medicaid
after incurring only $100.30 in medical expenses.[6]

The court certified a class of all persons who have been,
are being, or will be subjected to the Department's 6-month
spenddown requirement. On a motion for summary judg-
ment, the court found that the Department's use of the 6-
month spenddown period violated the statutory requirement
that the "same methodology" be used for determining eligibil-
ity of the medically needy as is used for the categorically
needy. App. to Pet. for Cert. A28.

The Department appealed to the Massachusetts Supreme
Judicial Court. It argued there that, since the eligibility
determination for the categorically needy does not involve a
spenddown at all, there is no methodology for the Depart-
ment to match. The Department further argued that federal
regulations explicitly allow a 6-month period.

---

[5] The spenddown may be satisfied by submission of paid or unpaid medi-
cal bills. 106 CMR § 506.540 (1985).

[6] Respondent Madeline McKenna was permitted to intervene in the
Superior Court proceedings. McKenna, like Rivera, was denied Medicaid.
McKenna's monthly countable income was calculated to be $531.66, which
is $106.66 in excess of the $425 eligibility standard for a family of two.
Thus, McKenna could receive medical assistance only after incurring medi-
cal expenses of $639.96 in a 6-month period.

The Supreme Judicial Court, by a unanimous panel vote, held that the Massachusetts requirement for a 6-month spenddown period was invalid. *Rivera* v. *Commissioner of Public Welfare*, 395 Mass. 189, 479 N. E. 2d 639 (1985). It relied in part, *id.*, at 197, 479 N. E. 2d, at 644–645, on a ruling by the United States District Court for the District of Massachusetts sustaining an identical challenge to the Department's 6-month spenddown regulation. See *Hogan* v. *Heckler*, 597 F. Supp. 1106, 1110–1113 (1984), subsequently reversed, 769 F. 2d 886 (CA1 1985), cert. pending *sub nom. Hogan* v. *Bowen*, No. 85–6386. Although noting that eligibility determinations for the categorically needy do not involve spenddowns, the court observed that such determinations do require the use of a 1-month computation period. Therefore, it concluded, in providing that the "same methodology" be employed, the Act requires that a 1-month period be applied in eligibility calculations for the medically needy.

## III

Congress created the spenddown provision in 1965 to eliminate a perceived weakness in the medical-assistance program then in effect. See Social Security Amendments of 1960, § 601(a), 74 Stat. 987. A 1965 Senate Report explained that under existing law some States used an absolute-income cutoff point. An individual with income just under the specified limit thus was able to obtain all the aid provided under the state plan, while one with income just over the limit was unable to obtain any assistance, even if the excess income was small when compared with the cost of the medical care needed. See S. Rep. No. 404, 89th Cong., 1st Sess., pt. 1, p. 78 (1965).

To cure this problem, the Medicaid statute was amended to require state eligibility standards to measure income in terms of both the State's allowance for basic maintenance needs *and* the cost of the medical care required. The standards applied to the medically needy are to be "reasonable"

and "comparable for all groups." Congress imposed no further instruction on the spenddown, stating only that a State is to take into account the costs incurred for medical care, "except to the extent prescribed by the Secretary." 42 U. S. C. § 1396a(a)(17).

Pursuant to this authority, the Secretary has provided, from the inception of Medicaid until the present time, that States may employ a maximum spenddown period of six months. See 45 CFR § 248.21(a)(4) (1970), originally promulgated as HEW Handbook of Public Assistance Administration, Supplement D, Medical Assistance Programs, D–4220(A)(4) (June 17, 1966). This regulation plainly permits what Massachusetts has done. We long have recognized that, perhaps due to the intricacy of the Act, "Congress conferred on the Secretary exceptionally broad authority to prescribe standards for applying certain sections of the Act." *Gray Panthers,* 453 U. S., at 43. See *Batterton* v. *Francis,* 432 U. S. 416, 425 (1977). The broad delegation to the Secretary in the spenddown provision includes the authority to provide the period in which the spenddown is to be calculated. Because the Secretary's regulation appears supported by the plain language of the statute and is adopted pursuant to the explicit grant of rulemaking authority in § 1396a(a)(17), it is "'entitled to more than mere deference or weight.'" *Gray Panthers,* 453 U. S., at 44, quoting *Batterton* v. *Francis,* 432 U. S., at 426. Indeed, it is entitled to "legislative effect," *id.,* at 425, and is controlling "unless [it is] arbitrary, capricious, or manifestly contrary to the statute," *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837, 844 (1984).

## IV

### A

Respondents contend that the Secretary's regulation, and Massachusetts' 6-month spenddown enacted pursuant thereto, are "manifestly contrary to the statute." Respondents point to another section of the Act, 42 U. S. C. § 1396a(a)(10)(C)

(i)(III), requiring that a State's plan describe "the single standard to be employed in determining income . . . eligibility . . . and the methodology to be employed in determining such eligibility, which shall be the same methodology" employed under SSI or AFDC. To respondents, this statutory language is an express congressional mandate that the same methodology, here the 1-month budget period, be applied to eligibility determinations for the medically needy. This requirement, the argument goes, operates as an express limitation on the Secretary's authority to regulate the state administration of spenddowns. Similarly, it is a direct restriction on the States, requiring them to use a 1-month period in which the medically needy must spend down, on medical expenses, their excess income.

## B

The history of the "same methodology" proviso, which first appeared in the Act in 1981, demonstrates that it was never intended to control the length of the spenddown. Rather, the "same methodology" requirement simply instructs States to treat components of income—e. g., interest or court-ordered support payments—similarly for both medically and categorically needy persons.

The "same methodology" proviso was not Congress' first attempt to regulate the relationship between treatment of the categorically needy and treatment of the medically needy. To understand the precise purpose of the "same methodology" proviso requires a brief foray into Congress' earlier efforts to address this relationship, for the proviso reflects Congress' desire to overrule a particular interpretation that had been advanced by the Secretary.

When Medicaid was first enacted, Congress did not require that the "same methodology" be used for determining the eligibility of categorically and medically needy individuals. Instead, it required only that a State's Medicaid plan use

"comparable" standards for both groups.[7] The Secretary and several Courts of Appeals interpreted the original "comparability" language to require virtually identical treatment. See, e. g., 38 Fed. Reg. 32216 (1973), originally codified as 45 CFR § 248.2; *Caldwell* v. *Blum*, 621 F. 2d 491, 495 (CA2 1980), cert. denied, 452 U. S. 909 (1981); *Greklek* v. *Toia*, 565 F. 2d 1259, 1261 (CA2 1977), cert. denied *sub nom. Blum* v. *Toomey*, 436 U. S. 962 (1978); *Fabula* v. *Buck*, 598 F. 2d 869, 872–873 (CA4 1979). Notably, no one advanced the claim that this "comparability" language prevented States from using a spenddown period of up to six months.[8]

Congress concluded that the administrative and judicial interpretation of the "comparability" provision denied States necessary flexibility to set eligibility standards and to adjust the scope of services to fit the varying requirements of medically needy persons. See H. R. Rep. No. 97–208, p. 971 (1981). Thus, as part of the Omnibus Budget Reconciliation Act of 1981 (OBRA), 95 Stat. 357, Congress amended the

[7] The 1965 legislation was to the effect that a State choosing to extend assistance to the medically needy provide "for making medical or remedial care and services available to all individuals who would, if needy, be eligible for aid or assistance under any . . . State [cash assistance program] and who have insufficient (as determined in accordance with comparable standards) income and resources to meet the costs of necessary medical or remedial care and services." 79 Stat. 345.

[8] The current version of the Act also contains a "comparability" requirement. See § 42 U. S. C. § 1396a(a)(17). Although the Supreme Judicial Court did not rely on "comparability" in arriving at its result, we note that that requirement did not mandate the use of a 1-month spenddown. The very purpose of § 1396a(a)(17) is to regulate the standards under which persons having incomes higher than allowed in the cash-assistance programs may still qualify for Medicaid; therefore, "comparability" cannot be read to require that the standards must be identical with those in the cash-assistance programs. Because the medically and categorically needy are different in a fundamental way, this Court previously has recognized that the comparability provisions of Medicaid "did not require that the medically needy be treated comparably to the categorically needy in all respects." *Schweiker* v. *Hogan*, 457 U. S. 569, 587 (1982). See *DeJesus* v. *Perales*, 770 F. 2d, at 323–324; *Hogan* v. *Heckler*, 769 F. 2d, at 891–897.

Medicaid Act by deleting the "comparability" requirement. After the amendment, a State was required only to include in its plan for the medically needy "a description of . . . the criteria for determining eligibility of individuals . . . for medical assistance." OBRA § 2171(a)(3)(C)(i), 95 Stat. 807.

The Secretary interpreted OBRA to authorize States to use income and resource criteria for medically needy different from those for categorically needy individuals:

> "States are no longer required to apply a uniform methodology for treating income and resources in such matters as deemed income, interest, court-ordered support payments, and infrequent and irregular income. Rather, the State plan must specify the methodology that will be used, and that methodology must be reasonable." 46 Fed. Reg. 47980 (1981).

The regulations promulgated by the Secretary accordingly left the States free to use eligibility standards that were unrelated to the standards used in AFDC or SSI, as long as the standards were "reasonable."[9] The Secretary's regulations did not address treatment of excess income for the medically needy or the calculation of spenddowns. Despite the various changes that followed OBRA's passage, many States contin-

---

[9] The Secretary further explained:

"Before the 1981 Amendments, the methodology for treatment of income and resources of the medically needy depended on the individual's relationship to a specific cash assistance program. For example, the methodology for deeming the income of medically needy aged, blind, and disabled was taken from the SSI program. . . . [T]he 1981 Amendments revised the Medicaid statute so that the direct linkage between the cash assistance programs and the medically needy is no longer explicit. . . . Therefore, we have concluded that the State need not adopt the methodology of a related cash assistance program in treating income and resources of the medically needy. Rather, the State may develop its own. However, section 1902(a)(17)(C) of the Act has not been amended. Consequently, these final regulations require that the State must use a methodology for the treatment of income and resources that is reasonable." 46 Fed. Reg. 47980 (1981).

ued to use a 6-month spenddown, in conformity with the still-existing regulation permitting that choice.

Congress disagreed with the Secretary's interpretation. See, *e. g.*, 127 Cong. Rec. 23363 (1981) (remarks of Rep. Waxman). This disagreement led to the enactment of the "same methodology" proviso, as part of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), § 137(a)(8), 96 Stat. 378. The House Report explained that TEFRA "makes clear that the Department [of Health and Human Services] had no authority to alter the rules that applied before September 30, 1981, with respect to medically needy income levels, medically needy resource standards, and the methodology for treating medically needy income and resources." H. R. Rep. No. 97–757, pt. 1, p. 13 (1982). The House Report further explained that TEFRA reaffirmed "the financial requirements previously in effect for the medically needy." *Ibid.*

Thus, the "same methodology" proviso was designed to correct a problem wholly unrelated to the 6-month spenddown, which had remained in force from the inception of Medicaid. The proviso operated solely to invalidate the post-OBRA regulations permitting the income and resource standards in state Medicaid plans to deviate from those used in the AFDC and SSI programs in "such matters as deemed income, interest, court-ordered support payments, and infrequent and irregular income." See 46 Fed. Reg. 47980 (1981). Treatment of excess income and the calculation of spenddowns were left untouched by the "same methodology" proviso.[10]

---

[10] Subsequent legislative history is to the same effect and makes clear that TEFRA did not address the length of the spenddown. In the Deficit Reduction Act of 1984, § 2373(c)(1), 98 Stat. 1112, Congress amended § 1396a(a)(17) to impose a moratorium on disapproving state Medicaid plans that might be inconsistent with the "same methodology" requirement. In doing so, Congress reaffirmed that its sole intent in enacting the "same methodology" requirement had been to invalidate the Secretary's 1981 regulations. See H. R. Rep. No. 98–861, pp. 1366–1367 (1984).

## V

The Medicaid Act itself is silent as to how -many months' excess income the State may require an individual or a family to contribute to medical expenses before Medicaid coverage of further medical expenses begins. The Secretary's interpretation of the Act is consistent with congressional intent, and under that interpretation Massachusetts is free to choose a 6-month spenddown. Accordingly, the judgment of the Supreme Judicial Court is reversed.

*It is so ordered.*