**Doyce ALLEN, Petitioner,**

v.

**UTAH DEPARTMENT OF HEALTH, DIVISION OF HEALTH CARE FINANCING, Respondent.**

No. 910287–CA.

Court of Appeals of Utah.

March 17, 1992.

Certiorari Granted June 22, 1992.

Steven Elmo Averett, Provo, for petitioner.

R. Paul Van Dam and J. Steven Mikita, Salt Lake City, for respondent.

Before BILLINGS, P.J., and BENCH and RUSSON, JJ.

## OPINION

BILLINGS, Presiding Judge:

Petitioner Doyce Allen (Allen) appeals from a final order of respondent Utah Department of Health, Division of Health Care Financing (DHCF) denying him Medicaid benefits. We affirm.

## FACTS

On January 23, 1991, Allen suffered a heart attack while in Arizona. He was subsequently transported to Utah where he underwent heart bypass surgery, resulting in medical costs exceeding $40,000.00. At the time of his heart attack, Allen had no health insurance and was ineligible for Medicare assistance because he was not sixty-five years old.

Allen applied for Medicaid benefits on February 4, 1991, seeking retroactive coverage to include medical bills incident to his heart surgery in January, 1991. Utah Medicaid guidelines require that Allen's assets be less than $3,000.00, on the first of each calendar month, to qualify for medical assistance. In both January and February, Allen owned a savings account in the amount of $3,029.86, a checking account in the amount of $100.00, a Lincoln automobile valued at approximately $600.00, a 1983 Ford pickup truck valued at approximately $2,500.00, and a 1981 travel trailer valued at approximately $7,000.00.

On February 19, 1991, the Office of Family Support denied Allen's Medicaid application, finding his resources exceeded the $3,000.00 limit. Allen requested a formal hearing, after which a DHCF hearing officer sustained the denial on the ground that Allen's "savings account alone exceeded

the limit." On April 29, 1991, the DHCF issued a Final Agency Action and Order on Review, adopting the findings and conclusions of the hearing officer. Allen then filed a Request for Reconsideration which was denied.

On appeal, Allen alleges the DHCF erred in denying his Medicaid application because: (1) The savings account funds are designated for burial expenses and, thus, exempt from consideration for Medicaid eligibility; (2) the travel trailer, modified to accommodate his wife's disabilities, is a medical necessity or personal effect and, thus, exempt from consideration for Medicaid eligibility; and (3) he should have been permitted to "spend down" his assets, by applying them to medical bills, in order to become eligible for Medicaid.

## I. THE SAVINGS ACCOUNT AS A BURIAL FUND

Allen contends that his $3,029.86 savings account should not be included for purposes of Medicaid eligibility because it is exempt as a burial fund.[1] In support of this claim, Allen points to a statement in his will directing that the savings account be used "to bury Doyce Allen and Lilly Allen." Allen alleges the will is properly before this court on appeal because it was submitted to the DHCF with his Request for Reconsideration. The DHCF responds that it is inappropriate for us to consider Allen's will as part of the record on review because it was never introduced as evidence at Allen's formal administrative hearing.

■ A review of the record reveals that a copy of Allen's will was first presented to the DHCF as an attachment to a letter from Allen's counsel, dated June 3, 1991, requesting a transcript of Allen's administrative hearing. The DHCF did not receive the will until June 10, 1991[2], after the hearing officer's Recommended Decision, the DHCF's Final Agency Action and Order on Review, and the DHCF's Response

---

**1.** Under the Utah Administrative Code, "a $1,500 burial or funeral fund exemption for each eligible household member" is permitted only if these funds "are separately identified and not commingled with other funds. They must be clearly designated so that an outside observer

can see that these funds are specifically for the client's burial expense." Utah Code Admin.P. R810-304-411(9)(e)(1) (1991).

**2.** Allen argues the will "was submitted at a time when the record was still open," pointing out that the letter to which the will was attached

to Request for Reconsideration had already been signed and dated. Because there is no indication that Allen's will was ever included as evidence before the DHCF, it is not properly a part of Allen's record on appeal.

■ However, even if we were to consider the general language in Allen's will, the result would not be different. Allen clearly and unequivocally testified the account was to pay for insurance premiums, not burial expenses. Allen did not specify the account as a burial fund on his original Medicaid application. During his formal administrative hearing, Allen did not argue or present any evidence indicating his savings account was designated for burial expenses. In fact, when the hearing officer specifically asked if the savings account might be a burial fund, Allen replied that "we earned it last summer for our insurance premiums, and they didn't go through, so we had this money for a nest egg, you might say. You have to have a little bit of something in case—." [3] Therefore, considering only the savings account for purposes of affirming on appeal [4], Allen's savings account alone surpassed the $3,000.00 Medicaid limit.

## II. MEDICAID "SPEND DOWN"

### A. An Overview of the Medicaid Program

Allen alternatively argues that he should have been permitted to spend his assets on medical bills in order to qualify for Medicaid. We look to both federal and Utah Medicaid regulations to resolve this question.

In 1965, Congress established the Medicaid program as Title XIX of the Social Security Act.[5] Medicaid is a cooperative federal-state program providing federal funds to assist individuals "whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396 (1992). States choosing to participate in this optional program are reimbursed for a portion of their costs in providing medical treatment to needy persons. *See Atkins v. Rivera*, 477 U.S. 154, 156–57, 106 S.Ct. 2456, 2458, 91 L.Ed.2d 131 (1986); *Weber Memorial Care Ctr., Inc. v. Utah Dept. of Health*, 751 P.2d 831, 832 (Utah App.), *cert. denied*, 765 P.2d 1278 (Utah 1988).

Participating states must develop a plan that complies with all federal Medicaid regulations. *See* 42 U.S.C. § 1396; *Atkins*, 477 U.S. at 157, 106 S.Ct. at 2458; *Weber Memorial*, 751 P.2d at 832. Each state must also select a single agency "to administer or to supervise the administration of the plan." 42 U.S.C. § 1396a(a)(5) (1992). In determining eligibility for its program, a state must provide benefits to the "categor-

---

was mailed on June 3, 1991. The letter, nevertheless, clearly bears a "Received June 10, 1991" stamp.

3. Allen testified that, after the DHCF denied Medicaid benefits, Allen, in fact, did not maintain the account as a burial fund. The following exchange occurred at the administrative hearing:

 HEARING OFFICER: What did you do with the $3,000 in February which you pulled out of the savings account?

 MR. ALLEN: Well, we paid bills that was accrued during our heart attack deal here, and transportation to and from.

 HEARING OFFICER: So, that money was spent on medical things?

 MR. ALLEN: Bills again.

 Contrary to his argument, Allen apparently neither considered nor used the savings account as a fund "separately identifiable" which was set aside "specifically" for burial expenses.

4. Allen also argues that his travel trailer, equipped with oxygen, and his truck, both used to transport Allen and his wife to a warmer climate during winter because of his wife's ill health, should be excluded from Medicaid eligibility consideration because they are exempt either as personal effects or medical necessities. *See* Utah Code Admin.P. R810–304–411(4), (5)(b) to (d) (1991). Furthermore, Allen asserts that, because his wife requires the truck and travel trailer for health reasons, neither vehicle is "available" to him, as contemplated by federal statutory Medicaid requirements. *See* 42 U.S.C. § 1396a(a)(17)(B) (1992). We find it unnecessary to reach these issues in view of our determination that Allen's savings account alone exceeded the Medicaid eligibility limit.

5. Pub.L. No. 89–97, as amended, 79 Stat. 343 (codified at 42 U.S.C. §§ 1396, et seq. (1992)).

ically needy"[6] but may provide benefits to the "medically needy"[7] at its discretion.[8]

### B. The Concept of "Spend Down" in Federal Medicaid Statutes

When a "medically needy" applicant's income or resources exceed the applicable state's Medicaid eligibility limits, the "spend down" rule may apply. Under this rule, the applicant may be able to "spend down" excess income or assets, by applying them to outstanding medical bills, to become eligible for Medicaid.

 In determining whether the federal Medicaid program requires states to adopt the "spend down" rule, courts have focused on the following portion of the Medicaid statutes:

(a) A State plan for medical assistance must ...

. . . . .

(17) ... include reasonable standards ... for determining eligibility for and the extent of medical assistance under the plan which (A) are consistent with the objectives of this subchapter, (B) provide for taking into account only such income and resources as are ... available to the applicant or recipient ... (C) provide for reasonable evaluation of any such income or resources, and (D) ... provide for flexibility in the application of such standards *with respect to income by taking into account ... the costs ... incurred for medical care or for any other type of remedial care recognized under State law.*

42 U.S.C. § 1396a(a)(17) (1992) (emphasis added). Courts recognize section 17(D) as the "income spend down rule," finding that state plans must permit a Medicaid applicant to "spend down" or deplete excess income to comply with a state's eligibility standards.[9]

The question in the present case, however, is whether the federal Medicaid regulations also require states to allow an applicant to "spend down" excess resources in the same manner. Allen contends that the federal Medicaid program requires states to implement "resource spend down" because it is necessary to fulfill the purpose of the Medicaid program and is reasonable. The DHCF responds that federal Medicaid regulations mandate "income spend down" but merely permit states to incorporate "resource spend down" within their plans at their discretion.

6. *See* 42 U.S.C. § 1396a(a)(10)(A)(i).

7. *See* 42 U.S.C. § 1396a(a)(10)(A)(ii).

8. The United States Supreme Court explained this distinction in *Schweiker v. Hogan,* 457 U.S. 569, 102 S.Ct. 2597, 73 L.Ed.2d 227 (1982):

Congress has differentiated between the categorically needy—a class of aged, blind, disabled, or dependent persons who have very little income—and other persons with similar characteristics who are self-supporting. Members of the former class are automatically entitled to Medicaid; members of the latter class are not eligible unless a State elects to provide benefits to the medically needy and unless their income, after consideration of medical expenses, is below state standards of eligibility.

*Id.,* 457 U.S. at 590, 102 S.Ct. at 2609.

9. *See, e.g., Atkins,* 477 U.S. at 158, 106 S.Ct. at 2459 ("the spenddown mechanism of 42 U.S.C. § 1396a(a)(17)" allows the medically needy to spend down "the amount by which their income exceeds" the eligibility level); *Foley v. Coler,* No. 83–C–4736, 1986 WL 20891 (N.D.Ill. Oct. 1, 1986) ("42 U.S.C. § 1396a(a)(17)(D) requires states to use income spend-down"); *Harriman v. Commissioner,* No. 90–0046–B, 1990 WL 284515 (D.Me. Nov. 9, 1990) (42 U.S.C. § 1396a(a)(17)(D) "specifically requires the state to have an income spend-down rule"); *Walter O. Boswell Memorial Hosp., Inc. v. Yavapai County,* 148 Ariz. 385, 714 P.2d 878, 881 (Ct.App.1986) ("Federal regulations implementing [42 U.S.C. § 1396a(17)] expressly require deduction of incurred medical bills from income for purposes of determining eligibility."); *Ramsey v. Department of Human Servs.,* 301 Ark. 285, 783 S.W.2d 361, 363 (1990) ("Under the 'medically needy' procedure, applicants are permitted to 'spend down' their excess income for medical expenses."); *Haley v. Commissioner of Pub. Welfare,* 394 Mass. 466, 476 N.E.2d 572, 574 (1985) (42 U.S.C. § 1396a(a)(17) "provide[s] for application of the spend down principle to income eligibility determinations"); *Kempson v. North Carolina Dept. of Human Resources,* 100 N.C.App. 482, 397 S.E.2d 314, 316 (1990) (The "explicit reference to *income* [in 42 U.S.C. § 1396a(a)(17)(D)] has been interpreted by the courts to mean that 'income spend-down' is allowed by the statute."), *aff'd,* 328 N.C. 722, 403 S.E.2d 279 (1991).

Courts considering the issue agree with the DHCF, finding the express statutory mandate is limited to "income spend down."[10] Courts conclude that federal Medicaid regulations permit, but do not require, states to employ "resource spend down."[11] We agree and conclude "resource spend down" is not mandated by federal law.

### C. Utah's Medicaid Program

■ Since Utah may implement "resource spend down" at its discretion, we must determine whether the Utah Medicaid plan has, in fact, adopted "resource spend down" in determining Medicaid eligibility. Utah courts have never addressed Medicaid "spend down" issues.

Utah chose to participate in the Medicaid program with the adoption of the Medical Assistance Act in 1981.[12] Utah has com-

plied with federal requirements by creating a state plan[13], which has been approved by the Secretary of Health and Human Services, and designating the DHCF as the agency responsible for Medicaid administration.[14] Utah's statutes describe the DHCF's responsibilities, in pertinent part, as follows:

[T]he division is responsible for the effective and impartial administration of this chapter in an efficient, economical manner. The division shall establish, on a statewide basis, a program to safeguard against unnecessary or inappropriate use of Medicaid services, excessive payments, and unnecessary or inappropriate hospital admissions or lengths of stay.

Utah Code Ann. § 26–18–2.3(1) (1989).

(2) The department shall develop implementing policy *in conformity with* this

---

**10.** Legislative history accompanying section 1396a(a)(17) points to only "income spend down" as a mandatory federal requirement. *See* S.Rep. No. 404, 89th Cong., 1st Sess., *reprinted in* 1965 U.S.Code Cong. & Admin.News 1943.

**11.** *See, e.g., Foley,* 1986 WL 20891 ("42 U.S.C. § 1396a(a)(17)(D) requires states to use income spend-down but is silent regarding resource spend-down.... Resource spend-down is thus permitted, but not required, by the Medicaid statute and regulations"); *Harriman,* 1990 WL 284515 ("The federal statute specifically requires the state to have an income spend-down rule.... But there is no similar requirement in the federal statute for a resource spend-down rule."); *Hession v. Illinois Dept. of Pub. Aid,* 129 Ill.2d 535, 136 Ill.Dec. 65, 71, 544 N.E.2d 751, 757 (1989) ("Simply stated, we perceive nothing in section 1396a(a)(17) which precludes a State that participates in the Medicaid program from using the resource spend down methodology if it chooses to do so."); *Hession v. Illinois Dept. of Pub. Aid,* 163 Ill.App.3d 553, 114 Ill.Dec. 665, 668, 516 N.E.2d 820, 823 (1987) ("section 1396a(a)(17) of the Act permits a state plan to utilize resource spend down in determining an applicant's eligibility for medical assistance benefits"), *aff'd,* 129 Ill.2d 535, 136 Ill.Dec. 65, 544 N.E.2d 751 (1989); *Harriman v. Commissioner,* 595 A.2d 1053, 1055 n. 2 (Me.1991) (court adopts prior holding of district court in this case that federal Medicaid statute "only permits, and does not require, a state to use an asset spend-down"); *Bemowski v. Department of Pub. Welfare,* 136 Pa.Commw. 103, 582 A.2d 103, 106 (1990) (the provision of medical benefits "to the medically needy by participating States is *optional* and may be excluded entirely from a State's Medicaid program").

*But see Ramsey,* 783 S.W.2d at 364 (court finds "no authority in any category for a 'spend-down' of excess resources that is similar or identical to the expressly authorized 'spend-down' of excess income"); *Kempson,* 397 S.E.2d at 317 (court stops short of holding "resource spend down" discretionary, stating that, although "§ 1396a(a)(17)(D) only mentions income in instructing states to provide flexibility in their program application standards, we note that § 1396(a)(17)(C) instructs that a state's plan must 'provide for reasonable evaluation of any such income or resources' ").

**12.** *See* Utah Code Ann. §§ 26–18–1 to –11 (1989 and Supp.1991).

**13.** *See* Utah Code Admin.P. RR455–1 to –48 (1991). Utah has elected to provide assistance to the "medically needy." *See* Utah Code Admin.P. R455–1–17 and R455–1–20 (1991). Assets Utah has designated as exempt from Medicaid eligibility determination, including the burial fund discussed earlier, are listed at Utah Code Admin. P. R810–304–411 (1991).

**14.** "[T]he Division of Health Care Financing ... shall be responsible for implementing, organizing, and maintaining the Medicaid program ... *in accordance with the provisions of* this chapter and applicable *federal law.*" Utah Code Ann. § 26–18–2.1 (1989) (emphasis added); *see also* Utah Code Ann. § 26–18–3(1) (Supp.1991) ("The department shall be the single state agency responsible for the administration of the Medicaid program in connection with the United States Department of Health and Human Services *pursuant to Title XIX* of the Social Security Act.") (emphasis added).

chapter, the requirements of *Title XIX*, and applicable federal regulations.

Utah Code Ann. § 26–18–3 (Supp.1991) (emphasis added).

> The department may develop standards and administer policies relating to eligibility under the Medicaid program.

Utah Code Ann. § 26–18–4(1) (1989).

Allen points to no Medicaid statute, regulation, or rule indicating that the Utah legislature has adopted "resource spend down" in determining Medicaid eligibility. Rather, Allen posits a more delicate argument which goes beyond literal statutory language. Specifically, Allen contends that Utah will not be following the federal requirement to use "reasonable standards" in determining Medicaid eligibility unless it applies "resource spend down."

Furthermore, Allen observes that Utah's Medicaid plan designates certain assets as exempt in determining eligibility for the "medically needy." [15] Allen, thus, argues that Utah has tacitly adopted a policy of allowing "medically needy" Medicaid applicants to maintain a level of income and resources for the necessities of life while still qualifying for Medicaid.

In support of these claims, Allen cites cases from other jurisdictions which, he argues, require "resource spend down" because, like Utah, they exempt certain assets from Medicaid eligibility determination. We read these cases differently. Courts in these jurisdictions have found a state mandate for "resource spend down" based on a specific legislative directive within their Medicaid plans, not just on the practice of allowing exemptions.

In *Haley v. Commissioner of Public Welfare*, 394 Mass. 466, 476 N.E.2d 572 (1985), the Supreme Judicial Court of Massachusetts closely examined both federal and its own state Medicaid laws to determine if "resource spend down" was mandated or simply permitted. The court, first, determined that, although the federal statutes did not require "resource spend down," it was a reasonable method of calculating resources and "consistent with the goals of Title XIX." *Id.*, 476 N.E.2d at 578. Therefore, the court concluded that it "must determine independently whether the Legislature intended to require the use of a resource spend down." *Id.* at 579. The court found a statute "explicitly appl[ying] a resource spend down," *id.* n. 9, as evidence of "the legislature's determination to ensure an individual's retention of a certain level of resources." *Id.* at 579. The court, thus, held that the Massachusetts Medicaid plan required "resource spend down."

The Supreme Court of Illinois performed an analysis similar to that of the *Haley* court in *Hession v. Illinois Department of Public Aid*, 129 Ill.2d 535, 136 Ill.Dec. 65, 544 N.E.2d 751 (1989). After concluding that the federal Medicaid statutes permit, but do not require, "resource spend down," the court turned its attention to the Illinois Medicaid plan. The court recognized that the plan included a provision whereby $1,500 in assets is exempt from Medicaid eligibility determination. However, the court, relying upon a specific Illinois statute, also stated: "In establishing an assistance program for these individuals, the legislature has noted that it is of special importance that their incentives for continued independence be maintained and that their limited resources be preserved." *Id.*, 136 Ill.Dec. at 71, 544 N.E.2d at 757 (citing Ill.Rev.Stat.1987, ch. 23, par. 5–1). Based on this clear manifestation of legislative intent, the court held that the Illinois Medicaid plan required "resource spend down."

Utah does not have such a saving, "resource spend down" provision in its Medicaid plan, nor any statement of policy expressing a desire to preserve the resources of potential beneficiaries.[16] Utah's

---

**15.** *See* Utah Code Admin.P. R810–304–411 (1991).

**16.** In fact, one commentator states:

> It is not only conceivable, but a fact that some unprepared applicants' assets are reduced beyond the poverty level to bankruptcy because medical bills in that month exceed those resources which the applicant cannot preserve under the Utah Exemptions Act. It [is] to the applicant's advantage to put forth any plausible argument that a particular value should

statutes, particularly those outlining the DHCF's authority [17], seem to evince a legislative concern for economy and efficiency in the Medicaid program, not the preservation of applicants' assets. Jurisdictions requiring "resource spend down," on the contrary, appear concerned about preserving the limited assets of Medicaid applicants.

We, unlike our colleague in dissent, cannot say it was unreasonable for the DHCF to choose not to adopt "resource spend down" in an otherwise completely optional state benefit plan. The expressed legislative concern is for economy and efficiency in implementing a Medicaid program, and we cannot see how this line-drawing offends the legislative delegation of power.

Utah's statutory scheme is more similar to that of Maine, recently reviewed in *Harriman v. Commissioner*, 595 A.2d 1053 (Me.1991). In *Harriman*, the Supreme Judicial Court of Maine recognized that its state plan does not include "resource spend down." "If the assets of applicants exceed the specified dollar limit, they are ineligible for assistance under the medically needy program, regardless of the amount of their medical expenses." *Id.* at 1056. Noting that "[t]he overall effect was to restrict as much as possible the number of eligible Medicaid recipients," the court stated: "For whatever reason—whether to achieve cost containment or to comply only with

the federal mandate or through simple oversight—the legislature stopped short of enacting an asset spend-down." *Id.* at 1057 (footnote omitted).

We, therefore, conclude there is nothing in the Utah Medicaid plan or its regulations that requires the utilization of "resource spend down." [18] Allen had $3,029.86 in his savings account at the time he applied for Medicaid. The DHCF, thus, correctly determined he was ineligible for Medicaid benefits as Utah has not adopted a "resource spend down" system.

RUSSON, J., concurs.

BENCH, Presiding Judge (concurring in part and dissenting in part):

I concur with part I of the main opinion and dissent from part II.

Whether a "medically needy" applicant may have been eligible for Medicaid by spending down his or her assets is a policy decision delegated in Utah to DHCF by Utah Code Ann. § 26–18–4(1) (1989). We review for reasonableness an agency's policy based on a legislative grant of discretion to interpret a statute. *See Morton Int'l, Inc. v. Auditing Div. State Tax Comm'n*, 814 P.2d 581 (Utah 1991).[1]

I do not believe the policy adopted by DHCF is reasonable since eligibility is de-

---

be counted as income rather than asset, if the reverse would result in excess assets. *Excess assets mean a denial of Medicaid eligibility;* excess income means that the applicant will be required to shoulder more of [his or] her health care costs for that month.
Ken Bresin, *Utah's Medicaid Program: A Senior's Eligibility Guide for Private Practitioners*, 14 J.Contemp.L. 1, 9 (1988) (emphasis added) (footnote omitted).

**17.** *See, e.g.,* Utah Code Ann. § 26–18–2.3(1) quoted above.

**18.** We agree with most courts which have considered the issue and believe the adoption of "resource spend down" is good public policy. *See e.g., Foley,* 1986 WL 20891 (a state resource spend-down provision furthers the general purpose of the Medicaid program); *Harriman,* 1990 WL 284515 ("Clearly, if the goal of Medicaid is to assist individuals who are medically needy—defined as having insufficient income or resources to meet the cost of necessary medical services—the sensible solution is the spend-

down rule."); *Hession,* 114 Ill.Dec. at 668, 516 N.E.2d at 823 (a state's adoption of resource spend down "would be in conformity with the purpose and spirit of the Act"); *Kempson,* 397 S.E.2d at 318 ("Our review of the case law reveals a pattern where Medicaid applicants are blindsided by this eligibility requirement simply because it is so illogical. Applicants who otherwise qualify are denied coverage because they have several hundred dollars above the reserve asset limit while at the same time they are liable for tens of thousands of dollars worth of medical bills.").

Nevertheless, a determination of the eligibility criteria for Medicaid benefits is not one for the courts to make.

**1.** I disagree with the majority's interpretation of Utah Code Ann. § 26–18–2.3(1) (1989) as an expression of intent to limit coverage. The Legislature's concern for economy and efficiency in the *administration* of the program simply does not have any logical relationship to the intended *coverage* of the program.

termined by when the medically needy applicant applies for benefits. Under DHCF's policy, the applicant who is savvy enough to spend down his or her assets before applying for medicaid would be eligible, while the applicant who applies for benefits before spending down is not eligible. Because that agency policy is not reasonable, I would allow Allen to spend down his assets before his eligibility is determined.

I would therefore reverse and remand the case for further proceedings.