GIUSEPPINA MATARAZZO *v.* AUDREY ROWE, COMMISSIONER OF INCOME MAINTENANCE (14593)

PETERS, C. J., CALLAHAN, BORDEN, NORCOTT and KATZ, Js.

Argued January 6—decision released April 6, 1993

*Judith I. Solomon,* for the appellant (plaintiff).

*Judith A. Merrill,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attor-

ney general, and *Richard J. Lynch* and *Hugh Barber*, assistant attorneys general, for the appellee (defendant).

BORDEN, J. The dispositive issue in this appeal is whether the department of income maintenance, by virtue of Connecticut's status as a § 209 (b) state under federal medicaid law, is required to grant medicaid coverage to the plaintiff for her outstanding medical bills retroactive to the time the plaintiff, having later spent her resources down to medicaid eligibility requirements, filed her application for such benefits. The plaintiff, Giuseppina Matarazzo, appeals from the judgment of the trial court dismissing her appeal from the decision of a fair hearing officer of the department of income maintenance (department), partially denying her medicaid benefits. We reverse the judgment of the trial court and remand the case for further proceedings consistent with this opinion.

The trial court found the following facts. In February, 1990, the plaintiff, who was sixty-two years old, was hospitalized because of a serious illness. Having no health care insurance, she filed an application for medicaid benefits with the department. In that application, the plaintiff, who was being assisted by her daughter, disclosed that she and her husband had a joint savings account of $9000, which represented their life savings.

Federal medicaid regulations require that, in order to be eligible for benefits, a married applicant have less than $2400 in assets. On the basis of information provided to them by an intake worker of the department, the plaintiff and her daughter reasonably believed that once the savings account had been reduced to less than $2400, the plaintiff's application would be approved retroactive to the filing date of the application. Consequently, the plaintiff and her daughter expected that

medicaid would cover the medical and hospital bills incurred by the plaintiff after the filing of her application.

When the plaintiff's application was finally approved on June 27, 1990, however, the department informed her that she would receive medicaid benefits only for medical expenses incurred after June 1, 1990.[1] Consequently, the plaintiff remained responsible for the substantial medical and hospital expenses, totaling approximately $150,000, that were incurred in the preceding three months even though the amount of those expenses far exceeded her available assets at any given time during that period.

The plaintiff requested a fair hearing to contest the department's refusal to employ a "resource spend down" policy to determine eligibility for medicaid benefits for persons whose incurred medical expenses exceed their total assets.[2] If the plaintiff had been entitled to a resource spend down, she would have become retroactively eligible for benefits for her medical expenses incurred from the time she was hospitalized in February and filed her application for benefits. The fair hearing officer refused to address the plain-

---

[1] June 1, 1990, was the first day of a month in which the plaintiff and her spouse had assets of less than $2400.

[2] State medicaid plans often provide that an applicant qualifies for assistance only if the applicant's resources for a given month do not exceed a preset amount, known as the "asset disregard." As noted above, the asset disregard in the present case was $2400. In many cases, however, although "an applicant may possess resources exceeding the monthly limit by a few hundred dollars, her medical bills for that month may total thousands of dollars beyond her available assets. A resource spend-down would allow this individual to apply the resources that are in excess of the limit to payment of the medical bills, leaving Medicaid to cover the balance." *Westmiller* v. *Sullivan*, 729 F. Sup. 260, 261–62 (W.D.N.Y. 1990). In other words, the applicant is allowed to spend down to the asset disregard level, and therefore become retroactively eligible, for up to three months, for medicaid assistance. Id., 262.

tiff's argument that she was entitled to resource spend down. Instead, the officer concluded that the plaintiff was not eligible for benefits for any time prior to June 1, 1990, because her marital assets had exceeded $2400 until that time.

The plaintiff appealed the department's partial denial of benefits to the trial court. The plaintiff claimed that both federal and state law require the department to utilize a resource spend down policy. The trial court rejected the plaintiff's claims and dismissed the appeal. The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

I

The plaintiff first claims that the department improperly denied her medicaid benefits for her hospital and medical expenses incurred prior to June 1, 1990, because federal law obligates the department to utilize a resource spend down policy in order to determine her eligibility for medicaid benefits. To understand and address the question of whether federal law so obligates the defendant, however, requires us to wade into the "Serbonian bog"[3] of federal and state laws regarding the medicaid system. See *Feld* v. *Berger,* 424 F. Sup. 1356, 1357 (S.D.N.Y. 1976).[4]

---

[3] See John Milton, Paradise Lost, bk. 2, l. 592 ("A gulf profound, as that Serbonian bog Betwixt Damiata and Mount Casius old, Where armies whole have sunk.").

[4] The relevant statutory scheme has also been described, by Judge Henry J. Friendly, as "almost unintelligible to the uninitiated." *Friedman* v. *Berger,* 547 F.2d 724, 727 n.7 (2d Cir. 1976), cert. denied, 430 U.S. 984, 97 S. Ct. 1681, 52 L. Ed. 2d 378 (1977); see also *Friedman* v. *Berger,* 409 F. Sup. 1225, 1225–26 (S.D.N.Y. 1976) (describing statutory scheme as "aggravated assault on the English language, resistant to attempts to understand it").

## A

The medicaid program, established in 1965 as Title XIX of the Social Security Act, and codified at 42 U.S.C. § 1396 et seq., " 'provid[es] federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons.' *Harris* v. *McRae,* 448 U.S. 297, 301, 100 S. Ct. 2671, 65 L. Ed. 2d 784, reh. denied, 448 U.S. 917, 101 S. Ct. 39, 65 L. Ed. 2d 1180 (1980); 42 U.S.C. § 1396 et seq. Although states participate voluntarily, a state electing to participate must develop a plan, approved by the secretary of health and human services, containing 'reasonable standards . . . for determining eligibility for and the extent of medical assistance . . . .' 42 U.S.C. § 1396a (a) (17)." *Clark* v. *Commissioner of Income Maintenance,* 209 Conn. 390, 394, 551 A.2d 729 (1988). Connecticut has elected to participate in the medicaid program and has assigned to the department the task of administering the program. General Statutes § 17-134a et seq.

"As originally enacted, [the] Medicaid [Act] required participating States to provide medical assistance to 'categorically needy' individuals who received cash payments under one of four welfare programs established elsewhere in the Act. . . . The categorically needy were persons whom Congress considered especially deserving of public assistance because of family circumstances, age, or disability. States, if they wished, were permitted to offer assistance also to the 'medically needy'—persons lacking the ability to pay for medical expenses, but with incomes [or resources] too large to qualify for categorical assistance." *Schweiker* v. *Gray Panthers,* 453 U.S. 34, 37, 101 S. Ct. 2633, 69 L. Ed. 2d 460 (1981).

Since its enactment, the Social Security Act has undergone substantial revisions. "In 1972, Congress replaced three of the four categorical assistance programs with a new program called Supplemental Security Income for the Aged, Blind and Disabled (SSI), 42 U.S.C. § 1381 et seq. . . . Under SSI, the Federal Government displaced the States by assuming responsibility for both funding payments and setting standards of need. In some States the number of individuals eligible for SSI assistance was significantly larger than the number eligible under the earlier, state-run categorical need programs.

"The expansion of general welfare accomplished by SSI portended increased Medicaid obligations for some States because Congress retained the requirement that all recipients of categorical welfare assistance—now SSI—were entitled to Medicaid. Congress feared that these States would withdraw from the cooperative Medicaid program rather than expand their Medicaid coverage in a manner commensurate with the expansion of categorical assistance. [I]n order not to impose a substantial fiscal burden on these States or discourage them from participating . . . Congress offered what has become known as the '§ 209 (b) option.'⁵ Under

---

⁵ Section 209 (b), as codified at 42 U.S.C. § 1396a (f), provides: "EFFECTIVE DATE OF STATE PLAN AS DETERMINATIVE OF DUTY OF STATE TO PROVIDE MEDICAL ASSISTANCE TO AGED, BLIND, OR DISABLED INDIVIDUALS. Notwithstanding any other provision of this subchapter, except as provided in subsection (e) of this section and section 1382h (b) (3) of this title, no State not eligible to participate in the State plan program established under subchapter XVI of this chapter shall be required to provide medical assistance to any aged, blind, or disabled individual (within the meaning of subchapter XVI of this chapter) for any month unless such State would be (or would have been) required to provide medical assistance to such individual for such month had its plan for medical assistance approved under this subchapter and in effect on January 1, 1972, been in effect in such month, except that for this purpose any such individual shall be deemed eligible for medical assistance under such State plan if (in addition to meeting such other requirements as are or may be imposed under the State plan) the

[§ 209 (b)], States could elect to provide Medicaid assistance only to those individuals who would have been eligible under the state Medicaid plan in effect on January 1, 1972. States thus became either 'SSI States' or '§ 209 (b) States' depending on the coverage that they afforded." (Internal quotation marks omitted.) *Schweiker* v. *Gray Panthers,* supra, 38–39.

States selecting the § 209 (b) option, therefore, have the right to impose more restrictive eligibility requirements than those mandated by the federal SSI program but, *as a limitation on that right,* may not adopt eligibility requirements that are more restrictive than the eligibility requirements that the state applied on January 1, 1972. See *Clark* v. *Commissioner of Income*

income of any such individual as determined in accordance with section 1396b (f) of this title (after deducting any supplemental security income payment and State supplementary payment made with respect to such individual, and incurred expenses for medical care as recognized under State law regardless of whether such expenses are reimbursed under another public program of the state or political subdivision thereof) is not in excess of the standard for medical assistance established under the State plan as in effect on January 1, 1972. In States which provide medical assistance to individuals pursuant to paragraph (10) (C) of subsection (a) of this section, an individual who is eligible for medical assistance by reason of the requirements of this section concerning the deduction of incurred medical expenses from income shall be considered an individual eligible for medical assistance under paragraph (10) (A) of that subsection if that individual is, or is eligible to be (1) an individual with respect to whom there is payable a State supplementary payment on the basis of which similarly situated individuals are eligible to receive medical assistance equal in amount, duration, and scope to that provided to individuals eligible under paragraph (10) (A), or (2) an eligible individual or eligible spouse, as defined in subchapter XVI of this chapter, with respect to whom supplemental security income benefits are payable; otherwise that individual shall be considered to be an individual eligible for medical assistance under paragraph (10) (C) of that subsection. In States which do not provide medical assistance to individuals pursuant to paragraph (10) (C) of that subsection, an individual who is eligible for medical assistance by reason of the requirements of this section concerning the deduction of incurred medical expenses from income shall be considered an individual eligible for medical assistance under paragraph (10) (A) of that subsection."

*Maintenance, supra,* 395. Because Connecticut has elected the § 209 (b) option; id., 395 n.4; *Gnutti* v. *Heintz,* 206 Conn. 628, 633, 539 A.2d 118 (1988); it may impose more restrictive eligibility requirements than those set by the SSI program, but may not impose stricter eligibility requirements than those applied pursuant to its January 1, 1972 plan.

In order to prevail on her federal law claim that Connecticut, as a § 209 (b) state, is obligated to apply a resource spend down rule, the plaintiff must necessarily establish that: (1) Connecticut utilized a resource spend down rule on January 1, 1972; and (2) federal law does not prohibit the use of resource spend down. See footnote 11.

As noted above, the fair hearing officer did not address the plaintiff's claim that she was entitled to retroactive benefits by virtue of a resource spend down rule. The trial court, however, found that the plaintiff had presented "both documentary and oral evidence tending to prove that both immediately before and after January 1, 1972, [the department] had a policy and practice of utilizing a resource spend down with respect to applicants whose assets exceeded the Medicaid limit. The testimony of case workers familiar with [the] defendant's practices, as well as [the] defendant's Uniform Policy Manual strongly suggest that had [the] plaintiff's application been considered under the practice in effect as of January 1, 1972, a resource spend down would have been utilized with respect to [the] plaintiff's excess assets."

In spite of this evidence, the trial court concluded that, because the plaintiff had not introduced the actual state medicaid plan in effect on January 1, 1972, she could not prevail on her claim. The trial court reasoned that § 209 (b), by its explicit terms, requires a state to continue to provide benefits subsequent to January 1,

1972, only if that assistance was required by *an approved state plan* in effect on that date. Consequently, the trial court concluded that it was "impossible to determine, therefore, whether the state plan then in effect required, as claimed by [the] plaintiff, the use of a resource spend down. Because the record is silent on this issue, [the] plaintiff cannot prevail [on] her claim."

The plaintiff claims in her brief and claimed at oral argument that she failed to enter the state plan into the record because the plan was "unavailable." Although the plaintiff at oral argument represented that she had attempted to procure a copy of the plan, the record is silent as to whether the plaintiff actually sought a subpoena to compel the state to produce the plan. The plaintiff did state, however, that "people have tried to get it" but that it was unavailable.

We agree with the trial court that a proper consideration of the plaintiff's claim must include an examination of the actual state plan in effect on January 1, 1972. We conclude, however, that, in light of our resolution of the other issues in this appeal, justice and fair dealing require us to order a remand so that the January 1, 1972 plan can be made part of the record and considered in adjudicating the plaintiff's claim.

We recognize that the appellant ordinarily bears the burden of establishing eligibility for benefits. *Harrison* v. *Commissioner of Income Maintenance,* 204 Conn. 672, 679, 529 A.2d 188 (1987).[6] In the present case,

---

[6] The principal issue in most fair hearings is whether the applicant for benefits is eligible under his or her particular financial circumstance. In such cases, the applicant is presumed to have relatively better access to the necessary evidence. In this case, however, the principal question is whether federal law requires a particular eligibility standard. Consequently, such an applicant is placed in a somewhat difficult procedural position, and strict adherence to the normal burden of production is less justifiable.

however, the department presumably[7] is in possession of the state plan, a document that the department has not published, is not part of the public record, and yet is crucial in establishing whether the plaintiff is legally entitled to medicaid benefits. Although the department is, of course, entitled to claim that a given applicant is not eligible for benefits, the department has a general responsibility to act in the best interests of the state and its citizens by granting medicaid benefits to those claimants who are legally entitled to receive them. Under these circumstances, therefore, we conclude that the department cannot prevail merely because the record does not contain the very evidence that the state should make readily available to the applicant.

In light of this conclusion, we remand the case for a further factual determination of whether the January 1, 1972 plan provided for resource spend down. Such a remand, however, would be unnecessary if we were to conclude that, even if the January 1, 1972 state plan so provided, the plaintiff could not prevail on her legal claims. Consequently, in the interest of judicial economy, we address them at this time.[8]

B

The plaintiff claims that, assuming that the January 1, 1972 plan provided for resource spend down, § 209 (b) requires Connecticut to continue to grant retroactive benefits to applicants who spend down their resources to the asset disregard level. The defendant argues, however, that even if the January 1, 1972 plan

---

[7] There has been some suggestion that the January 1, 1972 plan is "unavailable" because it has been either lost or destroyed. If this unfortunate scenario is true, the plaintiff would obviously be free to demonstrate, as she originally had attempted in the trial court, by reliance on evidence other than the missing plan, that it required a resource spend down rule.

[8] Despite the trial court's conclusion that the plaintiff could not prevail on her claim because there was no record evidence of the state plan, the trial court also exercised its discretion to address the plaintiff's legal claims.

provided for resource spend down, § 209 (b) and other federal regulations do not require the defendant to utilize resource spend down. We agree with the plaintiff.

We first note that we agree with the defendant that § 209 (b) does not authorize the state to create an alternative basis for eligibility for medicaid inconsistent with federal law, but merely permits the state to restrict the eligibility of persons who would otherwise qualify for such benefits under SSI standards. *Roloff* v. *Sullivan,* 975 F.2d 333, 340 (7th Cir. 1992); *Savage* v. *Toan,* 795 F.2d 643, 645–46 (8th Cir. 1986); *Morris* v. *Morrow,* 783 F.2d 454, 459–60 (4th Cir. 1986); *Foley* v. *Suter,* [1989-1 Transfer Binder] Medicare & Medicaid Guide (CCH), ¶37,695, p. 19,704 (N.D. Ill. 1988). This principle is incorporated into the federal medicaid regulations at 42 C.F.R § 435.121 (1991).[9] Consequently, § 209 (b) does not confer authority upon states to create less restrictive eligibility standards than exist nationally for SSI. *Morris* v. *Morrow,* supra, 459.

As noted above, however, § 209 (b) also prohibits a participating state from adopting eligibility requirements more restrictive than those utilized by the state in its January 1, 1972 plan. Thus, as long as an eligibility requirement is not more liberal than the current eligibility requirements of the SSI program, a § 209 (b)

[9] Title 42 of the Code of Federal Regulations, § 435.121 provides in relevant part: "INDIVIDUALS IN STATES USING MORE RESTRICTIVE REQUIREMENTS FOR MEDICAID THAN THE SSI REQUIREMENTS.

"(a) OPTION FOR USE OF MORE RESTRICTIVE ELIGIBILITY CRITERIA. The [state] agency may use Medicaid eligibility requirements for the aged, blind, or disabled that are more restrictive than the eligibility requirements for SSI. The agency may be more restrictive in defining blindness or disability, more restrictive in setting financial requirements for income or resources, or both. . . .

"(c) SPECIAL REQUIREMENTS. If an agency uses more restrictive requirements under this section—

"(1) *Each requirement may be no more restrictive than that in effect under the State's Medicaid plan on January 1, 1972, and no more liberal than that applied under SSI* . . . ." (Emphasis added.)

state must continue to utilize those eligibility require-
ments exercised in its January 1, 1972 plan.[10]

The dispositive question is, therefore, if we assume
that the January 1, 1972 plan provided for resource
spend down, whether the SSI program prohibits
resource spend down thereby making the resource
spend down standard more liberal than the eligibility
requirements of the SSI program.[11] We conclude that

[10] A state is free to change from § 209 (b) status to the normal SSI pro-
gram at any time. *Schweicker* v. *Gray Panthers,* 453 U.S. 34, 39 n.6, 101
S. Ct. 2633, 69 L. Ed. 2d 460 (1981). A § 209 (b) state electing to make
such a change must then utilize all SSI eligibility requirements even if those
requirements are more liberal than the requirements originally employed
as a § 209 (b) state. Id.

[11] In the present case, the trial court concluded that the SSI program
*did not prohibit* resource spend down. The trial court then proceeded, how-
ever, to consider whether the SSI program *requires* states to utilize resource
spend down, and concluded that it does not.

Although we agree that the SSI program does not *require* resource spend
down, we disagree with the trial court that, merely because SSI does not
*require* resource spend down, the plaintiff cannot prevail on her claim. Sec-
tion 209 (b) requires that a state may not impose more restrictive eligibil-
ity criteria than those imposed under the January 1, 1972 plan, even if those
criteria are also permitted under SSI. *Foley* v. *Suter,* [1989-1 Transfer
Binder] Medicare & Medicaid Guide (CCH), ¶37,695, p. 19,704 (N.D. Ill.
1988); see also *Brogan* v. *Miller,* 537 F. Sup. 139, 144 n.12 (N.D. Ill. 1982);
*Indiana Department of Public Welfare* v. *Payne,* Docket No.
49A02-9105-CV-230 (Ind. App., March 17, 1992). Consequently, even though
resource spend down is optional under standard SSI rules, Connecticut may
not impose more restrictive eligibility requirements than those utilized under
the January 1, 1972 plan. If, however, SSI *prohibits* spend down, then Con-
necticut would not be free, even as a § 209 (b) state, to utilize resource spend
down. *Foley* v. *Suter,* supra, p. 19,706.

*Roloff* v. *Sullivan,* 975 F.2d 333, 340 (7th Cir. 1992), despite the defend-
ant's claim at oral argument, is not to the contrary. First, the court in *Roloff*
did not reach the question whether SSI requires or permits resource spend
down, but merely addressed the plaintiff's claim based on an Indiana statu-
tory provision. Id., 337–38. Second, the applicant in that case sought med-
icaid benefits under the categorically needy program rather than the
medically needy program. Id. This difference is particularly significant in
light of amendments made to Title XIX by the Medicaid Catastrophic Care
Act. See footnote 12; *Roloff* v. *Sullivan,* supra, 340 n.11. Finally, the *Roloff*
court expressed its discomfort with the defendant's position in that case.
The court recognized that the defendant's argument, as in the present case,

the SSI program does not prohibit resource spend down, and thus Connecticut must provide for resource spend down if such a standard was required by its January 1, 1972 plan.

The plaintiff claims eligibility under the "medically needy" coverage group. Connecticut, at its option, has chosen to provide medicaid benefits to the medically needy: "those whose resources [or incomes] are sufficient to cover their ordinary living expenses, but not their medical care. 42 U.S.C. § 1396a (a) (10) (C); 42 C.F.R. §§ 435.300 through 435.340." *Clark* v. *Commissioner of Income Maintenance,* 209 Conn. 390, 394, 551 A.2d 729 (1988); see also *Camacho* v. *Perales,* 786 F.2d 32, 33–34 (2d Cir. 1986). Federal regulations generally require states providing coverage to the medically needy to evaluate an applicant's resources under the same standard used to determine eligibility for benefits under the categorically needy program. 42 C.F.R. § 435.845;[12] *Morris* v. *Morrow, supra,* 456; *Winter* v. *Miller,* 676 F.2d 276, 278 (7th Cir. 1982); *Foley* v. *Suter, supra,* p. 19,704.

The SSI statutes; 42 U.S.C. § 1381 et seq.; and the implementing regulations; 20 C.F.R. § 416.200 et seq.; do not explicitly prohibit *or* provide for resource spend down in determining eligibility for SSI. Consequently,

---

would allow a § 209 (b) state to receive the advantage of its § 209 (b) status, and yet pick and choose any SSI rules it wished, even if, contrary to the clear language of § 209 (b), such rules were more restrictive than those in effect on January 1, 1972. The court conceded that this result would probably be unlawful. Id., 341.

[12] Title 42 of the Code of Federal Regulations, § 435.845 provides in relevant part: "MEDICALLY NEEDY RESOURCE ELIGIBILITY. To determine eligibility on the basis of resources for medically needy individuals, the agency must . . .

"(e) (1) For aged, blind, or disabled individuals in States using requirements more restrictive than SSI, deduct the value of resources in an amount no more restrictive than those deducted under the Medicaid plan on January 1, 1972 and no more liberal than those deducted in determining eligibility under SSI."

resource spend down is not explicitly prohibited or provided for in determining eligibility for medicaid benefits under the "categorically needy" or "medically needy programs."

The defendant contends, however, that 42 U.S.C. § 1382 (a) (1) (B) does not allow deductions for incurred medical expenses in determining the "resources" of an applicant. Section 1382 (a) (1) (B) provides in relevant part: "Each aged, blind, or disabled individual . . . whose resources, other than resources excluded pursuant to section 1382b (a) of this title, are not more than . . . the applicable amount . . . shall be an eligible individual for purposes of this subchapter." The resource exclusions contained in 42 U.S.C. § 1382b (a)[13]

[13] Title 42 of the United States Code, § 1382b (a) (Sup. 1990) provides in relevant part: "RESOURCES (a) EXCLUSIONS FROM RESOURCES

"In determining the resources of an individual (and his eligible spouse, if any) there shall be excluded—

"(1) the home (including the land that appertains thereto);

"(2) (A) household goods, personal effects, and an automobile, to the extent that their total value does not exceed such amount as the Secretary determines to be reasonable; and

"(B) the value of any burial space or agreement (including any interest accumulated thereon) representing the purchase of a burial space (subject to such limits as to size or value as the Secretary may by regulation prescribe) held for the purpose of providing a place for the burial of the individual, his spouse, or any other member of his immediate family;

"(3) other property which is so essential to the means of self-support of such individual (and such spouse) as to warrant its exclusion, as determined in accordance with and subject to limitations prescribed by the Secretary, except that the Secretary shall not establish a limitation on property (including the tools of a tradesperson and the machinery and livestock of a farmer) that is used in a trade or business or by such individual as an employee;

"(4) such resources of an individual who is blind or disabled and who has a plan for achieving self-support approved by the Secretary, as may be necessary for the fulfillment of such plan;

"(5) in the case of Natives of Alaska, shares of stock held in a Regional or a Village Corporation, during the period of twenty years in which such stock is inalienable, as provided in section 1606 (h) and section 1607 (c) of Title 43;

"(6) assistance referred to in section 1382a (b) (11) of this title for the 9-month period beginning on the date such funds are received (or for such longer period as the Secretary shall by regulations prescribe in cases where

include, for example, the value of property such as the applicant's home, other property essential to self-support, and entitlements under various assistance programs. The defendant contends that, because incurred medical expenses are not enumerated among the resource exclusions, the SSI statutes and regulations prohibit consideration of such expenses.[14] We are unpersuaded.

good cause is shown by the individual concerned for extending such period); and, for purposes of this paragraph, the term 'assistance' includes interest thereon which is excluded from income under section 1382a (b) (12) of this title;

"(7) any amount received from the United States which is attributable to underpayments of benefits due for one or more prior months, under this subchapter or subchapter II of this chapter, to such individual (or spouse) or to any other person whose income is deemed to be included in such individual's (or spouse's) income for purposes of this subchapter; but the application of this paragraph in the case of any such individual (and eligible spouse if any), with respect to any amount so received from the United States, shall be limited to the first 6 months following the month in which such amount is received (or to the first 9 months following such month with respect to any amount so received during the period beginning October 1, 1987, and ending September 30, 1989), and written notice of this limitation shall be given to the recipient concurrently with the payment of such amount;

"(8) the value of assistance referred to in section 1382a (b) (14) of this title, paid with respect to the dwelling unit occupied by such individual (or such individual and spouse);

"(9) for the 9-month period beginning after the month in which received, any amount received by such individual (or such spouse) from a fund established by a State to aid victims of crime, to the extent that such individual (or such spouse) demonstrates that such amount was paid as compensation for expenses incurred or losses suffered as a result of a crime . . . ."

[14] The following SSI regulations establish a similar treatment of resources. Title 20 of the Code of Federal Regulations, § 416.202 (d) provides in relevant part: "You are eligible for SSI benefits if . . . You do not have more resources than are permitted (subpart L)." Section 416.1201 defines resources as "cash or other liquid assets or any real or personal property that an individual . . . owns . . . ." Section 416.1205 establishes the applicable resource standard after subtracting excludable resources. Section 416.1201 further provides for specified exclusions, that is, resources that are not considered in the resource standard. Incurred medical expenses are not listed among the specified exclusion.

First, incurred medical expenses are plainly not a "resource" in the parlance of the regulatory scheme, but, are in fact a debt owing to a health care provider or other party for services rendered or goods provided. As a matter of common sense, such a debt would not be included among the resources or assets of the applicant. Consequently, it is of little significance that incurred medical expenses are not included among the specified resource exclusions. Resource spend down is simply a methodology[15] by which to measure those resources "owned" by an applicant in light of outstanding liabilities for medical expenses.[16] Consequently, we

[15] The defendant argues, relying on *Foley* v. *Suter,* [1989-1 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶37,695, p. 19,704 (N.D. Ill. 1988), that resource spend down is not a "methodology" to evaluate the applicant's resources, but instead is a device utilized *after* the applicant's income is evaluated and determined to be excessive. We disagree. Although the term "methodology" is not defined by the statute, we can see no practical distinction between, on the one hand, measuring the applicant's resources by first employing spend down to determine eligibility, and, on the other hand, employing spend down to determine eligibility after originally finding an applicant ineligible. Indeed, the case cited above reaches virtually the same conclusion. After having decided that resource spend down is not a "methodology" to measure the applicant's resources, the court states: "Resource spend-down measures the applicant's resources in terms of his medical expenses, so that the applicant is not found ineligible in this situation." Id., p. 19,706. We can divine no difference between that approach and a "methodology" used to measure the applicant's resources.

[16] Even if we were to agree with the defendant's contention that resource spend down is not permitted under SSI—that is, the "categorically needy" program"—Congress has amended Title XIX to make clear that states could use income and resource methodologies in their medically needy programs that are more liberal than those used in the corresponding cash assistance programs. The Medicaid Catastrophic Care Act of 1988 (MCCA) states in relevant part: "(2) (A) The methodology to be employed in determining income and resource eligibility . . . may be less restrictive, and may be no more restrictive, than the methodology—

"(i) in the case of groups consisting of aged, blind or disabled individuals, under the supplemental security income program . . . .

"(B) For purposes of this subsection . . . [a] methodology is considered to be 'no more restrictive' if, using the methodology, additional individuals may be eligible for medical assistance and no individuals who are other-

conclude that § 1382 (a) (1) (B), § 1382b (a), and related regulations do not prohibit resource spend down.

This conclusion is additionally supported by 42 U.S.C. § 1396a (a), which provides in relevant part: "A State plan for medical assistance must . . . (17) . . . include reasonable standards . . . for determining eligibility for and the extent of medical assistance under the plan [and] . . . (C) provide for reasonable evaluation of any such income or resources, and (D) . . . provide for flexibility in the application of such standards with respect to *income* by taking into account . . . the costs . . . incurred for medical care . . . ."[17] (Emphasis added.)

wise eligible are made ineligible for such assistance." Pub. L. No. 100-360, § 303 (e) (5), 102 Stat. 683, 763 (1988), as amended by Pub. L. No. 100-485, § 608 (d), 102 Stat. 2343, 2418 (1988), codified at 42 U.S.C. § 1396a (r) (2).

Congress' intent to liberalize the methodology utilized in the medically needy programs is supported by the MCCA's legislative history: "In the view of the Committee, there is no justification for the rigid application of SSI eligibility rules to Medicaid medically needy programs. . . . To avoid any possible ambiguity, the bill provides that a methodology is considered to be 'no more restrictive' if, using the methodology, individuals qualify for Medicaid even though they would not be eligible were the SSI methodology used, and individuals who would be eligible for Medicaid under the SSI methodology would not be ineligible under the State's medically needy methodology." H. Rep. No. 105 (II), 100th Cong., 2d Sess. 74–75, reprinted in 1988 U.S. Code Cong. & Admin. News 857, 898.

Accordingly, because the MCCA would permit a less restrictive methodology in the medically needy program, assuming, of course, that SSI in fact prohibits resource spend down, federal law would not prohibit a state from applying such a methodology. If not otherwise *prohibited* by federal law, a § 209 (b) state may not adopt eligibility requirements that are more restrictive than those that the state applied on January 1, 1972, under the state plan. See footnote 12; *Foley* v. *Suter,* [1989-1 Transfer Binder] Medicare & Medicaid Guide (CCH), ¶37,695, p. 19,704 (N.D. Ill. 1988); see also *Brogan* v. *Miller,* 537 F. Sup. 139, 144 n.12 (N.D. Ill. 1982); *Indiana Department of Public Welfare* v. *Payne,* Docket No. 49A02-9105-CV-230 (Ind. App., March 17, 1992).

[17] Similarly, federal regulations require that the treatment of income and resources for determining eligibility for benefits under the "medically needy" program be uniform and reasonable. Title 42 of the Code of Federal Regulations, § 435.850 provides: "TREATMENT OF INCOME AND

Despite this broad language, the defendant argues that because § 1396a (a) (17) (D) specifically provides for income spend down but not resource spend down, the statute implicitly forbids the use of resource spend down.[18] The overwhelming weight of authority, how-

RESOURCES: GENERAL REQUIREMENTS. To determine eligibility of medically needy individuals, a Medicaid agency must use a methodology for the treatment of income and resources that is—

"(a) Uniform for all individuals in a covered group; and

"(b) Reasonable (see § 435.851)."

Title 42 of the Code of Federal Regulations, § 435.851 provides in relevant part: "TREATMENT OF INCOME AND RESOURCES: REASONABLENESS. (a) The agency must use a methodology for the treatment of income and resources, to determine eligibility of the medically needy, that is reasonable.

"(b) The methodology used to determine eligibility of individuals in the cash assistance program related to the covered medically needy group is presumed to be reasonable.

"(c) If the agency provides Medicaid for the aged, blind or disabled individuals who meet more restrictive requirements than used under SSI, the methodology for the treatment of income and resources of those aged, blind, or disabled individuals under the State's plan on January 1, 1972, is presumed to be reasonable. . . ."

These provisions imply, by their requirement of a reasonableness standard, that a range of methodologies may be appropriate in evaluating an applicant's income and resources. Moreover, 42 C.F.R. § 435.851 (c) specifically states that the methodologies used by § 209 (b) states under their January 1, 1972 plans are presumed to be reasonable. If Connecticut utilized a resource spend down under its plan, then resource spend down would be a reasonable method to determine eligibility for benefits. Consequently, unless prohibited by some other federal medicaid provision, resource spend down appears to be an appropriate methodology by which to determine eligibility in the medically needy program.

[18] A related provision, 42 C.F.R. § 435.301, provides in relevant part: "A medicaid agency may provide Medicaid to individuals specified in this subpart who—

"(1) Either—

"(i) Have income that meets the applicable standards in §§ 435.812 through 435.814; or

"(ii) If their income is more than allowed under those standards, have incurred medical expenses at least equal to the difference between their income and the applicable income standard; and

"(2) Have resources that meet the applicable standards in §§ 435.840 through 435.843."

The defendant argues that, again, no provision has been made for the deduction of incurred medical expenses from resources. Resource eligibil-

ever, has concluded that, despite the lack of an explicit provision providing for resource spend down, such a method is a *permissible* standard in evaluating an applicant's eligibility for benefits. *Foley* v. *Suter,* supra, p. 19,706; *Walter O. Boswell Memorial Hospital, Inc.* v. *Yavapai County,* 148 Ariz. 385, 388, 714 P.2d 878 (1986); *Hession* v. *Department of Public Aid,* 129 Ill. 2d 535, 544 N.E.2d 751, 757 (1989); *Harriman* v. *Commissioner of Human Services,* 595 A.2d 1053, 1055 n.2 (Me. 1991); *Haley* v. *Commissioner of Public Welfare,* 394 Mass. 466, 475–76, 476 N.E.2d 572 (1985); *Kempson* v. *Department of Human Resources,* 100 N.C. App. 482, 487, 397 S.E.2d 314 (1990); *Allen* v. *Department of Health,* 829 P.2d 122, 126 and n.11 (Utah App.), cert. granted, 843 P.2d 516 (Utah 1992); contra *Ramsey* v. *Department of Human Services,* 301 Ark. 285, 291, 783 S.W.2d 361 (1990).

We find the reasoning of the Massachusetts Supreme Judicial Court in *Haley* v. *Commissioner of Public Welfare,* supra, to be most persuasive. In *Haley,* the court concluded that "if an application of a resource spend down is consistent with the goals of Title XIX and is reasonable, it is authorized by Title XIX.

"We next determine whether utilization of a resource spend down is consistent with the Federal statutory scheme. Title XIX was 'designed to liberalize Federal law under which States operate their medical assistance programs so as to make medical services for the needy more generally available.' S.Rep. No. 404, 89th Cong., 1st Sess., reprinted in 1965 U.S. Code Cong. & Ad. News 1943, 2014 (hereinafter S.Rep.). To fulfill this goal, Congress sought to ensure eligibility to indi-

ity is determined, therefore, solely by reference to 42 C.F.R. §§ 435.840 through 435.843. These provisions, the defendant contends, require the state agency in determining eligibility simply to compare the applicant's resources to the asset disregard amount, and thus, to prohibit the application of a resource spend down policy. For the reasons stated above, we disagree.

viduals with income *and resources* which prevented
eligibility for other programs when the income *and
resources* were exceeded by incurred medical costs. See
42 U.S.C. § 1396a (a) (17); S.Rep. at 2017–2020, 2147.
A State must 'take into account only such income *and
resources* as (determined in accordance with standards
prescribed by the Secretary [of Health and Human Ser-
vices]) are actually available to the applicant or recipi-
ent and as would not be disregarded (or set aside for
future needs).' S.Rep. at 2018. A State may not 'require
the use of income *or resources* which would bring the
individual's income below the amount established as the
test of eligibility under the State plan. Such action
would reduce the individual below the level determined
by the State as necessary for his maintenance.' S.Rep.
at 2109. We conclude that, although Congress did not
require the use of a resource spend down, such use is
a reasonable method of evaluating resources.'' (Empha-
sis added.) Id., 475–76.

The court in *Haley* further reasoned that reading
Title XIX to prohibit resource spend down would frus-
trate the intent of Congress. ''The reasonableness of
applying a resource spend down to eligibility determi-
nations is apparent when one examines the effect of
eligibility determinations without a resource spend
down. An eligible individual is entitled to three months'
retroactive payment of medical expenses [pursuant to
Massachusetts law]. . . . Without a resource spend
down, an individual with excess resources who is aware
of the department's policy is in a better position than
the average individual who is unaware of the policy.
The aware individual can actually spend down his
excess resources as soon as he incurs medical expenses
which, absent excess resources, would be eligible for
payment. Once the resources are actually absorbed, the
individual is eligible for payment of medical expenses.

"The paradox occurs with a less sophisticated individual or an individual who is not in a condition actually to spend down resources. Upon application to the [agency], this individual would be informed that, because of excess resources, medical expenses incurred in the last three months would not be eligible for payment. This result would occur regardless of how miniscule the excess resources were in comparison to the medical expenses incurred in that three-month period." Id., 476 n.8.

The present case serves as a concrete example of the absurdity that would result from interpreting the federal scheme to prohibit resource spend down. The plaintiff has incurred medical expenses totaling approximately $150,000, and yet, at the time that her illness began, she had only $9000 in resources. The lack of resource spend down would, however, deprive her of eligibility for coverage of medical expenses that her resources are clearly inadequate to cover. We are unwilling to interpret the statute to reach a result that conflicts with Congress' intent to provide benefits for individuals whose income and resources are insufficient to meet necessary medical expenses, and that contradicts the great weight of authority.[19]

---

[19] Although not specifically relied upon by the defendant, the federal agency charged with the administration of the medicaid program, the Department of Health and Human Services (HHS), in 1980 issued an "Action Transmittal," HHS Action Transmittal 80-58, to all state agencies administering the medicaid program. This transmittal announced that HHS was taking the new position that, while Title XIX expressly allows for income spend down, neither the statute nor the rules promulgated thereunder allow for resource spend down.

Although a court ordinarily accords deference to interpretations issued by the agency charged with administering the statute; see *Chevron U.S.A. v. Natural Resource Defense Council, Inc.,* 467 U.S. 837, 844, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984); we join those courts that have concluded that the agency's interpretation in this case is not entitled to such deference. See, e.g., *Westmiller* v. *Sullivan,* 729 F. Sup. 260, 264 (W.D.N.Y. 1990); *Hession* v. *Department of Public Aid,* 129 Ill. 2d 535, 544 N.E.2d

In light of this analysis, we conclude that, if Connecticut utilized a resource spend down rule under the January 1, 1972 plan, § 209 (b) requires the department to grant retroactive benefits to the plaintiff. Because the plaintiff may still not prevail on this claim following resolution of the evidentiary issue related to the January 1, 1972 plan, we also address her independent state law claim.

## II

The plaintiff claims, as an alternative to her federal claim, that, even if § 209 (b) does not obligate the department to utilize resource spend down in evaluating her assets, Connecticut's asset disregard statute requires the use of resource spend down.[20] We disagree.

751, 757 (1989). The United States Supreme Court has concluded that an agency's interpretation is not entitled to great weight or deference if the interpretation is not made contemporaneously with the enactment of the statute and if it contradicts the position that the agency had previously taken. *General Electric Co.* v. *Gilbert,* 429 U.S. 125, 143–44, 97 S. Ct. 401, 50 L. Ed. 2d 343 (1976). "The weight given an administrative interpretation depends in part upon the thoroughness of its consideration [and] the validity of its reasoning. *Skidmore* v. *Swift & Co.,* 323 U.S. 134, 140, 65 S. Ct. 161–64, 89 L. Ed. 124 (1944). Moreover, deference can be overborne if a court finds that the agency interpretation is unreasonable because it violates the letter or spirit of the statute. *Capitano* v. *Secretary of Health & Human Services,* 732 F.2d 1066, 1076 (2d Cir. 1984)." (Internal quotation marks omitted.) *Westmiller* v. *Sullivan,* supra, 265.

Because the transmittal in the present case falls within the category of administrative interpretations that the United States Supreme Court has concluded is not entitled to deference, and in light of our own reading of the relevant federal law, we reject the 1980 position of HHS. The interpretation set forth in the transmittal was announced, not contemporaneously with the enactment of the federal statute, but fifteen years after its passage, and directly contradicted a position held by the agency for the previous fourteen years. Id.

[20] To prevail on this claim, the plaintiff must also establish that SSI does not prohibit resource spend down. In part I, we concluded that SSI permits resource spend down.

Specifically, the plaintiff relies on General Statutes § 17-82d (c),[21] which provides: "No person shall be eligi-

[21] General Statutes § 17-82d provides: "INVESTIGATIONS. GRANT OF AID. INCOME DISREGARD FOR FULL TIME STUDENTS. ASSET LIMITS. (a) The commissioner, upon receipt of an application for aid, shall promptly and with due diligence make an investigation, such investigation to be completed within forty-five days after receipt of the application or within sixty days after receipt of the application in the case of an application in which a determination of disability must be made. If an application for an award is not acted on within forty-five days after the filing of an application, or within sixty days in the case of an application in which a determination of disability must be made, the applicant may apply to the commissioner for a hearing in accordance with sections 17-2a and 17-2b. The commissioner shall grant aid only if he finds the applicant eligible therefor, in which case he shall grant aid in such amount, determined in accordance with levels of payments established by the commissioner, as is needed in order to enable the applicant to support himself, or, in the case of aid to dependent children, to enable the relative to support such dependent child or children and himself, in health and decency, including the costs of such medical care as he deems necessary and reasonable, not in excess of the amounts set forth in the various fee schedules promulgated by the commissioner of income maintenance for medical, dental and allied services and supplies or the charges made for comparable services and supplies to the general public, whichever is less, and the cost of necessary hospitalization as is provided in section 17-312, over and above hospital insurance or other such benefits, including workers' compensation and claims for negligent or wilful injury. The commissioner, subject to the provisions of subsection (b) of this section, shall in determining need, take into consideration any available income and resources of the individual claiming assistance. The commissioner shall make periodic investigations to determine eligibility and may, at any time, modify, suspend or discontinue an award previously made when such action is necessary to carry out the provisions of this chapter. The parent or parents of any child for whom aid is received under the provisions of part II of this chapter, and any beneficiary receiving assistance under part III of this chapter, shall be conclusively presumed to have accepted the provisions of sections 17-83e, 17-83f and 17-83g.

"(b) The commissioner shall disregard for six months per calendar year, any earned income of a child who is a full-time student in determining the eligibility, standard of need and amount of assistance of a family in the AFDC program.

"(c) No person shall be eligible for the state supplement program whose assets as defined by the commissioner exceed sixteen hundred dollars or, if living with a spouse, whose combined assets exceed twenty-four hundred dollars.

ble for the state supplement program whose assets as defined by the commissioner exceed sixteen hundred dollars or, if living with a spouse, whose combined assets exceed twenty-four hundred dollars.'' She contends that § 17-82d (c) requires that a married couple be entitled to retain $2400 of resources while receiving medicaid benefits. Without a resource spend down rule, the applicant is not eligible for retroactive coverage of incurred medical expenses, and thus is personally responsible for paying such bills. Consequently, the plaintiff, relying on *Hession* v. *Department of Public Aid,* supra, 757, *Walter O. Boswell Memorial Hospital, Inc.* v. *Yavapai County,* supra, 388, and *Haley* v. *Commissioner of Public Welfare,* supra, 475–76, contends that the department's failure to provide resource spend down requires her to deplete the assets that the legislature mandated should be retained.

Although we agree with the plaintiff that the resource spend down rule is a sensible method by which to determine eligibility for medicaid benefits, we disagree with her contention that resource spend down is *required* by § 17-82d (c). Nothing in the language of § 17-82d (c) suggests that the legislature intended to mandate that individuals be permitted to keep $2400 in resources. In fact, the plain language of the statute merely *prohibits* individuals from receiving benefits if they have assets over the asset disregard level.[22]

"(d) No family shall be eligible for the aid to families with dependent children program whose combined assets as defined by the commissioner exceed one thousand dollars."

The asset limit of § 17-82d, applicable to the state supplement program, is incorporated into the medicaid program by General Statutes § 17-134e, which provides: "EXTENSION OF OTHER PUBLIC ASSISTANCE PROVISIONS. All of the provisions of this chapter are extended to the medical assistance program except such provisions as are inconsistent with federal law and regulations governing Title XIX of the Social Security Amendments of 1965 and this part."

[22] Similar to our interpretation of the federal statutory and regulatory scheme, we do not read General Statutes § 17-82d, by itself, as necessarily *prohibiting* resource spend down.

The cases relied upon by the plaintiff holding that resource spend down is required by state law do not support her claim. These courts reached their conclusions based upon different state statutory and regulatory schemes. Moreover, each of the decisions relied upon statutory language in their respective jurisdictions that either explicitly provided for or strongly suggested a requirement of resource spend down. *Walter O. Boswell Memorial Hospital, Inc.* v. *Yavapai County*, supra, 388–90; *Hession* v. *Department of Public Aid*, supra, 757; *Haley* v. *Commissioner of Public Welfare*, supra, 477 n.9. In light of the absence of explicit language necessitating application of resource spend down, we conclude that state law, by itself, does not *require* the department to apply a resource spend down rule.

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

In this opinion the other justices concurred.