[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 I. STATEMENT OF CASE
This is an administrative appeal from a final decision of the State of Connecticut, Department of Social Services (DSS), brought pursuant to General Statutes §§ 17b-61 and 4-183. The plaintiff is Walter Dexter; the defendant is the Commissioner of DSS.
 II. PROCEDURAL HISTORY
Walter Dexter resides in a nursing home. Mr. Dexter's spouse applied to DSS for Title XIX medical assistance for long term care. The application was denied on November 9, 1999. Thereafter, the Dexters requested an administrative hearing. On February 15, 2000, an evidentiary hearing was conducted before a DSS Fair Hearing Officer (FHO). The FHO issued a written decision dated June 9, 2000 (Decision). The Decision included findings of fact and conclusions of law. The FHO affirmed the denial of Title XIX benefits. CT Page 5741-be
The plaintiff has commenced this administrative appeal through his petition for appeal filed in the Superior Court, judicial district of Hartford. This appeal was thereafter transferred to the judicial district of New Britain by order dated August 8, 2000, pursuant to previous orders of the court.
 III. JURISDICTION
A. Aggrievement
General Statutes § 17b-61 (b) provides, in pertinent part: "[T]he applicant. . . if aggrieved, may appeal therefrom in accordance with § 4-183." General Statutes § 4-183 (a) provides in relevant part that "[a] person . . . who is aggrieved by a final decision may appeal to the Superior Court. . . ." "To be an aggrieved person, one must be affected directly or in relation to a specific, personal and legal interest in the subject matter of the decision, as distinguished from a general interest such as is the concern of all members of the community, and the appellant must be specially and injuriously affected as to property or other legal rights." Smith v. Planning Zoning Board,203 Conn. 317, 321 (1987).
In the present matter the plaintiff was denied Title XIX benefits. The defendant in this appeal has not challenged aggrievement. This court finds that the plaintiff is aggrieved.
B. Timeliness of Appeal
General Statutes § 4-183 (c) provides, in relevant part: "Within forty-five days after mailing of the final decision under § 4-180 . . . a person appealing . . . shall serve a copy of the appeal on the agency that rendered the final decision . . . and file the appeal with the clerk of the superior court. . . ."
Through notice dated June 9, 2000, DSS transmitted the FHO's final decision. The plaintiff filed his appeal with the Superior Court, judicial district of Hartford. It was thereafter transferred to the judicial district of New Britain. The defendant has not raised a jurisdictional defect. Thus, this court finds the appeal to be timely.
 IV. STANDARD OF REVIEW
"Judicial review of [an administrative agency's] action is governed by CT Page 5741-bf the [Uniform Administrative Procedures Act (UAPA)] . . . and the scope of that review is very restricted. . . ." (Citations omitted; internal quotation marks omitted.) Cadlerock Properties v. Commissioner,253 Conn. 661, 668 (2000), U.S. cert. denied, 121 S.Ct. 1089 (2001). "The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." General Statutes § 4-183 (j).
 Judicial review of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . [T]he trial court may [not] retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact. . . . Our ultimate duty is to determine, in view of all the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . The substantial evidence rule governs judicial review of administrative fact-finding under the UAPA. General Statutes § 4-183 (j)(5) and (6). An administrative finding is supported by substantial evidence if the record affords-a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . The substantial evidence rule imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and to provide a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action. . . . [S]ubstantial evidence . . . is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. . . .
(Citations omitted; internal quotation marks omitted.) CadlerockCT Page 5741-bgProperties v. Commissioner, supra, 253 Conn. 676-77.
"The determination of whether substantial evidence exists is subject to de novo review by this court." Labenski v. Goldberg, 33 Conn. App. 727,733 (1994). Further, the court must search the entire record to determine whether substantial evidence exists to support the agency's findings of fact, and whether the conclusions drawn from those facts are reasonable.Dolgner v. Alander, 237 Conn. 272, 283 (1996).
 Judicial review of the conclusions of law reached administratively is also limited. The court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . Although the interpretation of statutes is ultimately a question of law . . . it is the well established practice of this court to accord great deference to the construction given [a] statute by the agency charged with its enforcement. . . . Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts.
(Citations omitted; internal quotation marks omitted.) CadlerockProperties v. Commissioner, supra, 253 Conn. 669.
 V. DISCUSSION Plaintiff's Claims of Error
The plaintiff, in his November 2, 2000 brief, has raised two claims of alleged administrative error: (1) the FHO erred in affirming the DSS denial of Title XIX benefits on the basis that parcel 13 is non-home property; (2) Parcel 13 is an excludable resource because it is property used in a trade or business and essential to the support of the plaintiff's spouse.
A. The Claim That the Hearing Officer's Decision Affirming the DSS Denial of Title XIX Benefits Based on a Finding That Parcel 13 Is Non-Home Property Is Error.
The plaintiff argues that the FHO's decision denying Title XIX benefits CT Page 5741-bh is contrary to both federal and state statutory and regulatory law. Specifically, the plaintiff contends that the FHO erred in finding that commercially leased real property known as Parcel 13, located at 2040 West Street in Southington, Connecticut is not excludable home property. (Plaintiff's Nov. 2, 2000 Brief, pp. 6, et seq.)
The FHO, in the June 9, 2000 final decision stated the following in relevant part:
 Based upon the hearing record and the pertinent law and regulations, it is determined that the Department acted correctly in accordance with the Department's regulations to assess the total value to the couple's assets as of the date of institutionalization for Title XIX Medical Assistance purposes. This officer agrees with the Department's estimate of the value of the couple's total countable asset value of $290,591.59 as of the August 17, 1999 date of institutionalization exceeded the maximum assets permitted by the assessment of spousal asset rules. . . .
 This officer disagreed with the representative's viewpoint that the commercially used lot owned by the appellant was actually part of the home property which should be excluded form (sic) asset consideration. The Parcel 13 lot leased out for a miniature golf range abuts the much larger lot on which the appellant's single family home is situated. However, that seems to be the only real relationship between the properties. The history of the two lots, Parcel 12 and 13 indicates that they were not one piece of homestead property as early as 1959. The homestead lot now known as Parcel 12 was acquired by the appellant and her husband from the institutionalized spouse's parents in 1959. The commercially used lot was once owned by these parents but passed through the estate of the mother, Anne Dexter, to her sons Walter and Richard (the institutionalized spouse and his brother) who remapped and redesignated the parcels. Separated lots on West Street such as Parcel 13 were sold to persons such as one Richard C. Sanger. possibly for commercial use. Parcel 13 was in part reacquired by the institutionalized spouse who eventually transferred it CT Page 5741-bi to the appellant. A right of way is recorded with this lot to access the interior lot on which the residence stands. The family right of way to the home property through this lot indicates the fact that the lot was owned and/or used by other than family members and that the lot is not truly part of the homestead property. A further indication of the independence of this property from the appellant's home is its commercial use. The miniature golf course business on the lot mirrors the commercial use of the adjoining, similar properties for such uses as a restaurant, batting cages, etc. The separate character of this lot is evidenced by the fact that it was not included with the home property transferred in 1959 from the (sic) Walter Dexter's parents. Also noted, especially in the 1969 re-mapping of the area was the fact that the subject lot is one of several similar separate lots on West Street distinct from the residence property. These adjoining lots of similar size and shape to the lot in question also are being commercially used as a restaurant, batting cages, etc by other than family members. This information together with the fact of the separate ownership history of the residence compared to the commercially used lot leads one to the conclusion that the lot #13, at 2040 West Street, with its Hidden Valley Golf complex is not part of the appellant's home property. As a lot separate from the residence lot with a different history and use, it is rather "non-home property" for Title XIX purposes. Lot Number 13 is other than residential property and it was properly evaluated by the Department as a countable non-home property asset for Title XIX eligibility purposes.
 This officer concurs with the Department's decision that the lot on which operates (sic) the seasonal Hidden Valley Golf course business is an asset to be considered towards the spousal assets. The representative's request for exclusion of the miniature golf course property as home property cannot be accepted. A review of the provisions of the lease indicates the appellant's ability to sell the property after the exercise or declining of the purchase option by the leassee (sic)/business operator and the lease CT Page 5741-bj provides the procedures involved. Neither the lease nor the purchase option provision makes the property's value "inaccessible" to the appellant. The value of the property is available to the appellant per the lease terms and it is expected that there would not have been a resigned lease after a Title XIX long term care application without consideration of the Department's decision on the value of the property toward eligibility. The value of the non-home property, even when productive as in this case, must be considered as a countable asset in the Title XIX Medical Assistance Program must be reduced.
(Decision, p. 8-10.)
In support of these conclusions, the FHO made twenty separate findings of fact:
 1. On August 25, 1999 an application for title XIX Medical Assistance was received on behalf of the appellant's spouse, a nursing home patient.
 2. The appellant's spouse was first institutionalized on August 17, 1999 when he was admitted to Tandem Health Care in Waterbury, a skilled nursing facility.
 3. On or about November 4, 1999 the Department completed an assessment of spousal assets and determined the couple's total assets to be $290,591.59 as of the August 17, 1999 date of institutionalization.
 4. As of the date of institutionalization, the couple's counted assets included $35,283.38 in three Webster Bank accounts, a total of $3,753.08 in cash value of John Hancock Life Insurance policies, $1,555.13 in the value of Northeast Utility stocks, and the value of $250,000.00 of non-home property from a commercially leased lot at 2040 West Street, Southington.
 5. Included in the Department's assessment of countable assets was the value of $250,000.00 for a CT Page 5741-bk 1.4 acre parcel of land, known as 2040 (also listed as 20600) (sic) West Street, Southington, Connecticut which has been solely owned by the community spouse upon quit claim from her husband on February 29, 1996.
 6. The Department considered the lot at parcel 13/2040 West Street with its leased commercial establishment known as "Hidden Valley Golf" non home property, estimated the value as $250,000.00 per assessed value by the Town of Southington and the purchase value per an existing lease and counted the value as an asset in the spousal assessment property when the appellant declined to agree to place the property for sale.
 7. This lot at 2040 West Street, Southington, known as parcel 13 (Map 195, Southington Land Records) formerly known as parcel B abuts the parcel 12, (Map 195) which is an interior 12.6 acre lot at 1984 West Street on which the appellant's single family residence is situated.
 8. The parcel 13 lot at 2040 West Street, Southington which contains the "Hidden Valley Golf" commercial site is a separate lot from the home property lot which passed to the appellant and her spouse from his parents, Walter and Anna Dexter on 11/5/1959 and has had a series of owners including the institutionalized spouse and his brother, Richard C. Sanger and the estate of Anna Dexter.
 9. The parcel 13 lot at 2040 West Street, Southington is currently and has been a lot separate from the parcel 12 lot surrounding the appellant's residence, has been previously sold and used by other owners other than the appellant and her husband, contains a family right of way to the residence lot and has been used commercially by others since at least 1989.
 10. The parcel 13 lot at 2040 West Street, Southington is not part of the home owned property of the appellant but it is non home property for Title CT Page 5741-bl XIX purposes.
 11. The Department determined that as of the August 17, 1999 date of institutionalization the total asset amount of $290,591.59, that the spousal share was the maximum $81,960.00 and the permitted assets for the couple was $83,560.00 including the institutionalized spouse including the Title XIX asset limit of $1,600.
 12. On or about November 4, 1999 Department notified the appellant and his spouse of the results of the Assessment of Spousal Assets and that the maximum asset level for the couple was $83,560.00.
 13. The appellant's Title XIX Medical Assistance application of August 25, 1997 was denied on November 4, 1999 due to assets in excess of the Title XIX limit.
 14. The community spouse's total shelter costs for Spousal Assessment purposes was $466.09 per month from a $206.67 real estate tax expense, $10.42 in homeowner's insurance and the $249.00 Standard Utility Allowance.
 15. As of the date of application, the community spouse was entitled to an excess shelter allowance of $51.34 in the MMNA calculation as her shelter costs of $466.09 did exceed the excess shelter standard of $415.75 or 30% of $1382.50
 16. The community spouse's basic MMNA was $1,433.84 per month at the time of application when the excess shelter amount of $51.34 was added to the basic allowance of $1,382.50 at the time of application.
 17. The community spouse has income of $340.50 per month from a gross Social Security benefit, interest income at $70.93 on the non-property related assets and $2,800.00 in income from the least of lot #13. CT Page 5741-bm
 18. The community spouse's available income of $340.50 from a Social Security benefit, the interest income of $70.93 on the non property related assets of $40,591.59 and the $2,800.00 per month property related lease income exceeded the appellant's Minimum Monthly Needs Allowance of $1,433.84 by $1,777.59 per month.
19. The community spouse had sufficient income to meet her MMNA of $1,433.84.
 20. The appellant has excess resources which exceed the Title XIX asset level for MCCA spouses and the couple must reduce the value of their assets.
(Citations to record omitted; Decision, pp. 2-5.)
In Ross v. Giardi, our Supreme Court reviewed the history of the medicaid program. The court stated in part: "The medicaid program, established in 1965 as Title XIX of the Social Security Act, and codified at 42 U.S.C. § 1396 et seq., provid[es] federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons. 42 U.S.C. § 1396 et seq. Although states participate voluntarily, a state electing to participate must develop a plan, approved by the secretary of health and human services, containing reasonable standards . . . for determining eligibility for and the extent of medical assistance. . . . 42 U.S.C. § 1396a (a)(17). Connecticut has elected to participate in the medicaid program and has assigned to the department the task of administering the program. General Statutes § 17-134a et seq." (Citations omitted; internal quotation marks omitted). Ross v. Giardi, 237 Conn. 550, 555-56 (1996). See also Ahernv. Thomas, 248 Conn. 708, 713 et seq., (1999).
The medicaid program has undergone changes since its enactment:
 In 1988, Congress passed into law the Medicaid Catastrophic Care Act (catastrophic care act). 42 U.S.C. § 1396r-5 (1988). This enactment was intended, in part, to ease the financial burden placed on a community spouse[8] under the prior statutory regime that required the institutionalized spouse to spend down a large portion of the couple's resources, and thus impoverish the community spouse, before CT Page 5741-bn becoming eligible for medicaid. Under the catastrophic care act, a community spouse is entitled to receive a "`community spouse resource allowance'" (resource allowance), which is approximately one half of the couple's total liquid resources or $60,000, adjusted annually for inflation, whichever is less. 42 U.S.C. § 1396r-5 (f)(2); see also Uniform Policy Manual (1996) § 4022.05(B)(2) (using adjusted figures). The resource allowance is protected from the institutionalized applicant's health care obligations and does not count against the applicant's financial eligibility.
(Citations omitted; Footnote in original.) Burinskas v. Department ofSocial Services, 240 Conn. 141, 148-49 (1997.)
"The legislative history of the MCCA establishes that Congress sought to end the pauperization of community spouses "by assuring that the community spouse has a sufficient — but not excessive — amount of income and resources available to her while her spouse is in a nursing home.' H.R. Rep. No. 100-105 (II), 100 cong., 2d Sess. at 65 (1988), reprinted in 1988 U.S.C.C.A.N. 857, 888." O'Callaghan v.Commissioner of Social Services, 53 Conn. App. 191, 211 (1999).
In determining the resources of an individual, certain limited categories of property are excluded. One such exclusion is the home property of the medicaid applicant. See e.g. 42 U.S.C. § 1382b (a) (1). The applicable federal regulation provides in part "[i]n determining the resources of an individual (and spouse, if any) the following items shall be excluded: (a) the home (including the land appertaining thereto). . . ." 20 C.F.R. § 416.1210 (a). A home is defined as "any property in which an individual (and spouse, if any) has an ownership interest and which serves as the individual's principal place of residence. This property includes the shelter in which an individual resides, the land on which the shelter is located and related out-buildings." 20 C.F.R. § 416.1212 (a).
The State of Connecticut Department of Social Services (DSS) administers the Connecticut medicaid system, General Statute § 17b-260. Pursuant to General Statutes § 17b-10(c), DSS, in carrying out its regulatory authority, has promulgated a Uniform Policy Manual (UPM). The UPM recognizes categories of excluded assets not to be counted in determining the individual's eligibility for assistance. This includes home property. UPM § 4020.10 provides in, pertinent part: "A. HomeCT Page 5741-boProperty. Real property used as principal residence by the assistance unit is excluded. 1. Home property consists of the home itself which the assistance unit uses as its principal residency, the surrounding property which is not separated from the home by intervening property owned by others, and any related out buildings used in the operation of the home." See also UPM § 4030.20 A.2.
The term "Home Property" is defined in relevant part as "real property which someone owns and is using as principal residence. . . ." UPM § 4000.01. Conversely, the term "Non-Home Property" is defined as "real property which a person owns but is not using as principal residence." UPM § 4000.01
The plaintiff contends that both parcel 12 and parcel 13 meet the definition of home property as defined above. A map of the property shows that parcel 13 adjoins parcel 12. The Dexters' residence is located on parcel 12. (Record, p. 98). There is no property owned by others which intervenes and separates parcel 12 from parcel 13. The FHO found that, "[t]his lot at 2040 West Street, Southington, known as parcel 13 . . .abuts parcel 12 . . . on which the appellant's single family residence is situated." (Emphasis added) (Record, p. 13, Finding of Fact #7). The plaintiff argues that the FHO analysis should have ended after a determination that parcel 12 and 13 are adjoining parcels. (Plaintiff's November 2, 2000 Brief, p. 11.) Additionally, the plaintiff argues that the FHO "analysis of the history of ownership of the property and the nature of its use is irrelevant to the determination of whether parcel 13 is home property under federal and department regulations." (Plaintiff's November 2, 2000 Brief, p. 11.)
The defendant contests the plaintiff's position by arguing that "[i]n claiming that the Fair Hearing Officer erred in considering the commercial use of lot 13, the plaintiff would have this court ignore the requirement that property serve as an individual's principal residence to qualify as that individual's home property. He would have the Court eviscerate the requirement that an individual's shelter be located on a piece of land for that land to qualify as home property." (Defendant's December 28, 2000 Brief, p. 12.)
To analyze this issue, the court must apply established rules of construction. "As in the case of a statute, the regulation must be construed according to the commonly approved usage of the language."Citerella v. United Illuminating Co., 158 Conn. 600, 608 (1969). "When a statute or regulation is open to interpretation, common sense must be used." Id., 609. "In construing any statute [or regulation], we seek to CT Page 5741-bp ascertain and give effect to the apparent intent of the legislature. . . . [W]hen the language . . . is plain and unambiguous, we need look no further than the words themselves because we assume that the language expresses the legislature's intent. . . . When the language of a statute [or regulation] is unclear, we may ascertain the intent of the legislature by looking beyond the language to the . . . history and the purpose that the statute [or regulation] was intended to serve." (Citations omitted; internal quotation marks omitted.) Weinberg v. ARAVending Co., 223 Conn. 336, 340-41 (1992). Additionally, "[i]f the words of a statute [or regulation] are clear . . . courts will not speculate as to any supposed intention because the question before a court then is not what . . . [was] actually intended, but what intention it expressed by the words that it used. . . . In the absence of ambiguity, statutory [or regulatory] language should be given its plain and ordinary meaning." (Internal quotation marks omitted.) Collins v. Goldberg, 28 Conn. App. 733,737 (1992). The "fundamental objective is to ascertain and give effect to the apparent intent of the legislature [or regulatory agency]. . . ." (Internal quotation marks omitted.) State v. Burns, 236 Conn. 18, 22
(1996). Further, "[i]f a statute [or regulation] is capable of two constructions, one that is rational and effective in accomplishing the evident legislative object, and the other leading to `bizarre results' destructive of that purpose, the former should prevail." (Internal quotation marks omitted.) Id., 23.
The parties do not disagree that the plaintiff's residence is situated on parcel 12, consisting of approximately twelve acres of land. Further, they do not dispute that parcel 13 is being used for commercial purposes.
In applying the aforementioned rules of construction to the regulation's language at issue, the court finds that both federal and state regulations consistently and centrally focus upon the use of the property, excluding only that property used as a principal residence. "A home is any property . . . which serves as the individual's principal place of residence." 20 C.F.R. § 416.1212 (a). "Home Property is . . . real property which someone owns and is using as a principal residence," while "Non-Home Property" is "real property which a person owns but is not using as a principal residence." UPM § 4000.01. In accordance with the regulatory and statutory focus upon the real property's usage, the court finds that the FHO correctly concluded "that the commercially leased lot at 2060 West Street in Southington is non-home property, which must be valued and considered a countable asset." (Decision, p. 12.) CT Page 5741-bq
The fact that parcel 13 adjoins parcel 12, or that it provides a right of way, does not alter the commercial use of the property. Furthermore, the FHO's conclusion is consistent with the fundamental objective of the catastrophic care act, namely, to "assur[e] that the community spouse has a sufficient — but not excessive — amount of . . . resources available to her, while her spouse is in a nursing home." O'Callaghan v.Commissioner of Social Services, supra, 53 Conn. App. 211. The plaintiff's interpretation would "[lead] to "bizarre results' destructive of that purpose." State v. Burns, supra, 236 Conn. 23. Accordingly, the plaintiff's first claim of error is rejected.
B. The Plaintiff's Contention That Parcel 13 Must Be Excluded Because Income Derived From Its Commercial Use Is Essential To The Plaintiff's Self Support.
The plaintiff argues in the alternative that this court should "exclud[e] parcel 13 from countable resources . . . [because] it is property essential to Mrs. Dexter's self-support." (Plaintiff's November 2, 2000 Brief, p. 15 et seq.) According to the plaintiff, "Parcel 13 of the Dexter property is `property . . . that is used in a trade or business'" within the meaning of 20 C.F.R. § 416.1220. (Plaintiff's November 2, 2000 Brief, pp. 15, et seq.) The defendant responds to plaintiff's argument by asserting that the federal regulations relied upon are not applicable to the medicaid program administered by DSS because the State of Connecticut is designated as a § 209(b) state. (Defendant's December 28, 2000 Brief, pp. 19 et seq.)
Our Supreme Court in Ross v. Giardi, addressed this issue.
 Since its enactment, the Social Security Act has undergone substantial revisions. In 1972, Congress replaced three of the four categorical assistance programs with a new program called Supplemental Security Income for the Aged, Blind and Disabled (SSI), 42 U.S.C. § 1381 et seq. . . . Under SSI, the Federal Government displaced the States by assuming responsibility for both funding payments and setting standards of need. In some States the number of individuals eligible for SSI assistance was significantly larger than the number eligible under the earlier, state-run categorical need programs.
 The expansion of general welfare accomplished by SSI CT Page 5741-br portended increased Medicaid obligations for some States because Congress retained the requirement that all recipients of categorical welfare assistance — now SSI — were entitled to Medicaid. Congress feared that these States would withdraw for the cooperative Medicaid program rather than expand their Medicaid coverage in a manner commensurate with the expansion of categorical assistance. [I]n order not to impose a substantial fiscal burden on these States or discourage them from participating . . . Congress offered what has become known as the § 209(b) option.[5] Under [§ 209(b)], States could elect to provide Medicaid assistance only to those individuals who would have been eligible under the state Medicaid plan in effect on January 1, 1972. States thus became either SSI States or § 209(b) States depending on the coverage that they afforded.
 Connecticut has elected the § 209(b) option. As a § 209(b) state, Connecticut may choose to apply more restrictive eligibility criteria to applicants for medicaid benefits than the federal government applies to applicants for SSI benefits. The state, however, may not apply eligibility criteria that are more restrictive than the criteria contained in its medicaid plan in effect on January 1, 1972. 42 C.F.R. § 435.121 (1992). In Matarazzo[v. Rowe, 225 Conn. 314 (1993)], we further held that the state must apply the eligibility criteria contained in the 1972 plan unless the criteria are prohibited by the SSI program, even if the use of the criteria results in medicaid eligibility for an individual who is not eligible for SSI benefits. . . .
 As we stated in Matarazzo v. Rowe, supra, 225 Conn. 325, "we agree with the defendant that § 209(b) does not authorize the state to create an alternative basis for eligibility for medicaid inconsistent with federal law, but merely permits the state to restrict the eligibility of persons who would otherwise qualify for such benefits under SSI standards.
(Footnote in original.) Ross v. Giardi, supra, 237 Conn. 556-71 (1996).
The court finds, in this case, that, as a § 209(b) state, CT Page 5741-bs Connecticut has elected not to include income producing real property in the category of excludable assets that exceed the eligibility limit in value. Thus, by including parcel 13 in assessing eligibility, the FHO determined from the record presented that "[t]he community spouse's MMNA is $1,433.84 per month for the date of application. The appellant had income of $340.50 (gross) from a Social Security award, $70.93 interest income from $40,591.59 from nonproperty related assets and $2,800.00 from the commercially leased property. The community spouse has total income which exceeds her MMNA by $1,777.59 per month and the community spouse and her husband have excess assets for Title XIX eligibility." (Decision, p. 13.) The FHO continued, stating, "[w]hile the Federal Food Stamp Program policy regarding non-home property permits its exclusion from asset consideration if the income stream yielded by the property is commensurate with the its (resource) (sic) value, there is not such an exclusion in the Title XIX Medical Assistance Program." (Decision, p. 12.)
It must be noted, however, that UPM § 4030.65 C. 1 does provide that "[n]on-home property of any type is excluded as long as the assistance unit is making a bona fide effort to sell it." According to the defendant, the plaintiff has elected to place parcel 13 on the market for sale and is currently receiving medicaid benefits. (Plaintiff's Dec.28, 2000 Brief, p. 4, footnote 1.)
The court finds that the plaintiff has not prevailed on its second claim of error. Thus, the plaintiff's second claim of error is rejected.
 VI. CONCLUSION
For all the foregoing reasons set forth herein, the appeal from the FHO's June 9, 2000 final decision is ordered dismissed.
BY THE COURT
PETER EMMETT WIESE, JUDGE